James H.M. Sprayregen, P.C.
Edward O. Sassower, P.C.
Nicole L. Greenblatt
David S. Meyer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| SBARRO LLC, *et al.*,[1] | ) |
| | ) Case No. 14-10557 (MG) |
| Debtors. | ) |
| | ) Joint Administration Requested |
| | ) |

**DECLARATION OF CAROLYN SPATAFORA,**
**CHIEF FINANCIAL OFFICER OF SBARRO LLC**
**(I) IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY**
**PLEADINGS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

Carolyn Spatafora, being duly sworn, deposes and states:

1.      I am the Chief Financial Officer of Sbarro LLC ("***Sbarro***"), a privately-held

corporation organized under the laws of the state of New York and a debtor and debtor in

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sbarro LLC (1939); Carmela's, LLC (8088); Carmela's of Kirkman LLC (7703); Carmela's of Kirkman Operating, LLC (1182); Corest Management, Inc. (9134); Cucinova Easton LLC (4874); Cucinova Holdings LLC (2698); Cucinova Kenwood LLC (9558); Cucinova Olentangy LLC (8264); Demefac Leasing Corp. (2379); Larkfield Equipment Corp. (7947); Las Vegas Convention Center LLC (7645); New Sbarro Finance, Inc. (6440); New Sbarro Intermediate Holdings, Inc. (9105); Sbarro America, Inc. (9130); Sbarro America Properties, Inc. (9540); Sbarro Blue Bell Express LLC (1419); Sbarro Commack, Inc. (4007); Sbarro Express LLC (0253); Sbarro Holdings, Inc. (7352); Sbarro New Hyde Park, Inc. (6185); Sbarro of Las Vegas, Inc. (2853); Sbarro of Longwood, LLC (0328); Sbarro of Virginia, Inc. (2309); Sbarro Pennsylvania, Inc. (3530); Sbarro Properties, Inc. (9541); Sbarro Venture, Inc. (3182); Sbarro's of Texas, Inc. (5139); Umberto at the Source, LLC (8024); Umberto Deer Park, LLC (8728); Umberto Hauppauge, LLC (8245); Umberto Hicksville, LLC (0989); Umberto Huntington, LLC (8890); and Umberto White Plains, LLC (8159).  The Debtors' service address is:  401 Broadhollow Road, Melville, New York 11747.

possession in the above-captioned cases of Sbarro and certain of its affiliates as debtors and debtors in possession (collectively, the "***Debtors***").  In such capacity, I am generally familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2.       I submit this declaration (this "***Declaration***") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Bankruptcy Rules***") in support of the voluntary petitions for relief filed by each of the Debtors under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") and the motions and applications for related relief filed as of the date hereof (the "***Petition Date***") or concurrently herewith (collectively, the "***First Day Pleadings***").  I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into chapter 11, preserve and maximize the value of the Debtors' estates and, ultimately, achieve a successful reorganization.  I also believe that, absent immediate access to additional financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as sought under and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of these estates.

3.       Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other executives, employees or the Debtors' professional advisors, including Kirkland & Ellis LLP ("***K&E***"), Moelis & Company ("***Moelis***"), and Loughlin Management ("***Loughlin***") and/or my opinion based upon my

experience, knowledge and information concerning the Debtors' operations, financials, and the food service and restaurant industry generally.[2]   Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.   This financial information is also presented on a consolidated basis for the Debtors and their non-Debtor affiliates.  I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein.

### Preliminary Statement

4.      While the Debtors possess a worldwide brand and potential for future growth, their existing capital structure is unsustainable and their operational and financial performance has fallen significantly short of expectations due to an unprecedented decline in mall traffic that continues to hamper retailers and restaurant operators.   The Debtors have undertaken an extensive review of their store portfolio and operations and developed a revised business plan focused on a smaller national footprint, concentrating exclusively on profitable store locations rather than national presence.   Ultimately the Debtors, in consultation with their advisors, have determined that a restructuring is necessary to effectively implement their store closure strategy, quickly deleverage their capital structure to more appropriately align with the new business plan, and maximize recoveries for their stakeholders.   Following negotiation with their secured creditors, the Debtors have commenced these chapter 11 cases to obtain access to $20 million in new money debtor-in-possession financing and to implement a pre-packaged restructuring designed to eliminate approximately $128 million (more than 85 percent) of prepetition funded

---

[2]      I previously served as Senior Vice President of Finance of Sbarro.  I joined Sbarro in March 2005 as Director of Finance and Controller.   Prior to joining Sbarro LLC, I was employed by Adecco, a staffing services company, for ten years as a Director and Assistant Vice President in positions of Internal Audit and Information Technology.   I also spent five years at KPMG as a Certified Public Accountant.

debt. [3]  With their prepackaged plan serving as a baseline restructuring alternative, the Debtors intend to subject the plan to an overbid process to maximize creditor recoveries and, toward that end, have proposed bid procedures and a plan confirmation timeline designed to allow the Debtors to emerge expeditiously from chapter 11 as a smaller, more profitable, well-capitalized, and more competitive company, better equipped for growth in accordance with their revised business plan.

5.      As described further below, the Debtors are a global operator of Italian quick service and casual table dining restaurants, operating 217 company-owned restaurants nationally and 582 franchised restaurants nationally and internationally, employing more than 2,700 employees, and with annual revenues in excess of $38 million.  With a strategy premised on offering delicious, fresh, and authentic Italian food items and excellent customer service, the Debtors are the largest mall-focused Italian restaurant concept in the world and have earned substantial credibility within the national food service and restaurant industry.

6.      Like other retail businesses and restaurant operators, however, the Debtors' financial performance is sensitive to volatility in commodity prices and consumer discretionary spending, which have negatively impacted the Debtors since the global economic downturn that commenced in 2007 and 2008.  Price surges for the Debtors' key raw materials (cheese and flour) coupled with unprecedented declines in mall traffic during the height of the economic recession resulted in continued underperformance through 2010, resulting in the Debtors and their predecessors filing chapter 11 cases in April 2011.  Eight months after the 2011 chapter 11 filing, the Debtors emerged from bankruptcy having reduced their total debt from approximately

---

[3]    The debt reduction contemplated by the Debtors' prepackaged Plan assumes (i) a Payout Event does not occur (*i.e.* - creditors are not paid in cash under an alternative transaction as a result of the plan overbid process described further below) and (ii) the original aggregate principal amount of the DIP Facility is converted into the Exit Facility.

$400 million to $130 million, secured $35 million in new money commitments, closed certain unprofitable locations, and successfully negotiated amendments to numerous leases with key landlords. The significant financial and operational restructurings undertaken in connection with their 2011 chapter 11 cases, however, have not been sufficient to compensate for trends that have negatively affected the Debtors' businesses and the overall economy since the Debtors' adopted their current capital structure.

7.      Since November 2011, the Debtors have continued to face reduced consumer demand due to an even further decline in mall foot traffic, as well as increased pressure from innovative competitors in a fragmented market. While the Debtors have launched initiatives to diversify their offerings and venue types and reposition the Sbarro brand as one of freshness and handmade quality, these efforts could not overcome the slow-recovering economic climate. National mall traffic has continued to decline, contributing to negative same store sales measures in both 2012 and 2013. Compared to projections for 2012 and 2013 EBITDA of approximately $25 and $31 million, respectively (adjusted EBITDA of $30 and $36 million, respectively), the Debtors' EBITDA fell to $15 million in 2012 and under $4 million in 2013. With these severe economic headwinds and financial underperformance, the Debtors developed a portfolio optimization plan to reduce their national footprint (and associated costs) by shedding a significant number of unprofitable store locations to focus on key, profitable restaurants. The Debtors also began exploring solutions for a comprehensive restructuring solution to address the reality that enterprise value is significantly less than the amount of the Debtors' secured debt.

8.      In December 2013, Sbarro engaged Moelis as its investment banker, Loughlin as its financial advisor, and K&E as its restructuring counsel to advise the Debtors on a potential restructuring. Following a comprehensive analysis of the Debtors' debt service requirements and

operations, the Debtors and their advisors determined that the Debtors could not continue to service their existing secured debt and concluded that an accelerated financial and operational restructuring would be necessary to preserve the valuable brand, implement an appropriate store closure plan, and continue operations as a going concern.

9.      Beginning in January, the Debtors' key stakeholders — the Prepetition Secured Lenders (as defined herein) — began to organize and directed the Prepetition Agent (as defined herein) to retain legal and/or financial advisors.  Following significant diligence by the Prepetition Secured Lenders and the Prepetition Agent's advisors, in late February the Prepetition Secured Lenders provided the Debtors with a proposal to purchase the Debtors' business pursuant to a credit bid under a plan of reorganization.  After extensive, good-faith negotiations with the advisors for the Prepetition Agent and the Prepetition Secured Lenders, the Debtors have agreed on the terms of the restructuring transaction incorporated in (and to be implemented through) the Debtors' *Proposed Joint Prepackaged Chapter 11 Plan of Reorganization of Sbarro LLC and its Debtor Affiliates* (including all exhibits related thereto, the "***Plan***"), filed contemporaneously herewith.[4]

10.     The proposed Plan, which received near unanimous support from the Debtors' prepetition secured lenders, with holders of approximately 98% of the outstanding Prepetition Secured Claims voting to accept the Plan,[5] provides for a standalone restructuring based on a $35 million credit bid of Prepetition Secured Claims and $20 million in debtor-in-possession financing that will convert to an Exit Facility upon consummation of the proposed Plan.  If

---

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[5]   The 98% acceptance rate by dollar amount of the Prepetition Secured Claims was calculated excluding the votes of insiders.  Approximately 97% of the number of holders voted to accept the Plan (also excluding insiders).  In connection with the prepetition solicitation of votes on the Plan, 100% of the holders of Prepetition Secured Claims returned ballots, and only one holder of 2% in amount of the Prepetition Secured Claims voted to reject the Plan.

confirmed on a standalone basis, the Plan will: (a) reduce the Debtors' total funded debt (including interest) by approximately 85%, from approximately $148.2 million as of March 5, 2014 to approximately $20 million under an Exit Facility; (b) provide the Debtors with long-term financing to support their go-forward business needs and increase free cash flow through significant annual interest expense savings; (c) allow for the efficient implementation of the Debtors' portfolio optimization plan; and (d) allow the company to maintain going-concern operations for the benefit of its more than 2,700 employees while further executing against its turnaround plan to position for long-term success.

11.    Under the Credit Bid incorporated in the Plan there is no distributable value beyond the Prepetition Secured Lender Claims (which claims are themselves significantly impaired) and, therefore, no recovery for general unsecured creditors.[6]  To ensure creditor recoveries are maximized, however, the Plan expressly contemplates an overbid process to allow any strategic or financial investor to "top" the Plan.  To facilitate the overbid process, the Debtors intend to seek approval of bidding procedures that will set the framework and timeline for the submission of overbids.

12.    At the same time, the Debtors are cognizant of the costs associated with the Chapter 11 Cases and the urgent need to recapitalize the business, right-size the debt burden, and ensure sufficient liquidity for investments in the Debtors' operational strategy.  Therefore, the Debtors believe that confirming the proposed Plan as expeditiously as possible -- in the absence of any qualifying overbids -- will maximize value for their estates.  Toward that end, the Debtors are requesting that the Court establish a hearing date for approval of the Disclosure Statement and confirmation of the Plan as early as April 22, 2014.  In the event the Debtors receive

---

[6]    Because the Plan provides for no recoveries to general unsecured creditors that class is deemed to reject the Plan and the Debtors did not solicit votes from such class.

qualifying overbids, they may adjourn the confirmation hearing to accommodate the overbid process. The Debtors believe that their proposed timeline and bidding procedures appropriately balance the Debtors' urgent need to restructure with the goal of maximizing value and potential recoveries for all of their stakeholders.

13.    In sum, the Debtors, with the near unanimous support of their Prepetition Secured Lenders, have created a holistic restructuring solution that will enable the Debtors to promptly emerge from chapter 11 well-positioned to execute on their revised business plan and to compete successfully in the competitive food service and restaurant market.  For the reasons described herein, I believe that the compromise contemplated by the Plan is fair and equitable, provides the best recovery available to the Debtors' stakeholders, and will position the Debtors to achieve their financial and operating plan.

14.    To familiarize this Court with the Debtors, their businesses, and the initial relief sought by the Debtors to stabilize operations and facilitate their restructuring, this Declaration is organized as follows:    ***Section I*** provides an overview of the Debtors' history. ***Section II*** summarizes the Debtors' prepetition capital structure and corporate structure. ***Section III*** describes the Debtors' current operations.  ***Section IV*** describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' restructuring initiatives. ***Section V*** summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.  ***Section VI*** provides an overview of the exhibits attached hereto that set forth certain additional information about the Debtors, as required by Local Bankruptcy Rule 1007-2.

## I.
## Company History

15.    In the 58 years since the Sbarro family opened their first Italian restaurant in Brooklyn, New York, Sbarro, together with its Debtor and non-debtor affiliates, has grown into a

leading owner, operator, and franchisor of Italian quick service restaurants ("*QSR*s")[7] and the largest mall-focused restaurant concept in the world — with over 2,700 employees and a global base of approximately 800 restaurants in 35 countries. Under various brand names, the Debtors and their non-debtor affiliates developed one of the first quick-service restaurant concepts that extended beyond offering one primary specialty item, such as pizza or hamburgers.

16.    In 1985, with a base of 83 company-owned stores and 53 franchised restaurants, Sbarro went public, offering shares of its common stock on The New York Stock Exchange, and began a period of rapid growth correlating with the expansion of shopping malls. On September 28, 1999, members of the Sbarro family (who owned approximately 34.4 percent of Sbarro's common stock) obtained 100 percent of the issued and outstanding common stock through a "going-private" transaction.

17.    In January 2007, entities controlled by MidOcean Partners III, L.P. and certain of its affiliates, a leading private equity investment firm, acquired Sbarro and its affiliates from the Sbarro family. As described above, the economic downturn of 2007 and 2008 severely impacted Sbarro's performance, and in April 2011 Sbarro filed chapter 11 cases. Upon emergence from the prior restructuring, certain senior lenders took ownership of the company through conversion of the second lien and unsecured bond debt to equity as part of the restructuring. The timeline below generally outlines the sequence of events described above.

| | |
|---|---|
| **1956** | Opening of original Sbarro in Brooklyn, NY. |
| **1967** | First mall-based location at King's Plaza. |
| **1977** | Sbarro, Inc. organized. |

---

[7]    QSRs include both food-court and in-line restaurants. Food-court restaurants are primarily located in areas that are exclusively designated for multiple-vendor restaurant use and share a common dining area, such as food courts located in shopping malls. In-line restaurants are often larger, buffet-style restaurants that provide designated table seating. Approximately 90 percent of the Debtors' QSRs are located in shopping malls, with the remaining QSRs located in, among other places, airports, downtown and casinos. In contrast to QSRs, casual dining restaurants are traditional, full service restaurants with table service and wait staff.

| **1985** | IPO with 83 company-owned and 53 franchised units. |
| **1999** | Take-private transaction by the Sbarro family. |
| **2007** | Acquisition by MidOcean. |
| **2011** | Filed chapter 11 cases, consummated by fully consensual chapter 11 plan that reduced funded debt by nearly 70%. |

## II.
## Prepetition Capital Structure and Corporate Structure

### A.    Prepetition Capital Structure.

18.    As of the Petition Date, the Debtors have outstanding funded debt for borrowed money in the aggregate principal amount of approximately $148.2 million.  These obligations arise under that certain Credit Agreement dated as of November 28, 2011 (as it may be amended, modified, waived or supplemented from time to time, the "***Prepetition Secured Credit Agreement***"), by and among New Sbarro Intermediate Holdings, Inc., as borrower ("***Intermediate Holdings***"), New Sbarro Finance, Inc. ("***Holdings***") and certain of Holdings' subsidiaries (excluding, among other entities, joint ventures), as guarantors (the "***Prepetition Term Loan Guarantors***"), Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, the "***Prepetition Agent***") and certain lenders from time to time party thereto (the "***Prepetition Secured Lenders***").  The $148.2 million of term loan debt outstanding under the Prepetition Secured Agreement, which was the exit financing facility put in place under the Debtors' 2011 chapter 11 plan of reorganization consists of (i) $61.3 million outstanding in first-out term loans (each a "***Prepetition First-Out Loan***") and (ii) $86.9 million outstanding in second-out term loans (each a "***Prepetition Second-Out Loan***").  Borrowings under the Prepetition Secured Credit Agreement bear interest, (i) with respect to the Prepetition First-Out Loan, at the Debtors' option, at either (a) the LIBOR rate (subject to a floor of 1.5%) plus 8% or (b) an alternative base rate plus 7% or (ii) with respect to the Prepetition Second-Out Loan, at the Debtors' option, at either (a) the LIBOR rate (subject to a floor of 1.5%) plus 12.5%

or (b) an alternative base rate plus 11.5%. Additionally, pursuant to the Prepetition Secured Credit Agreement, payment in kind ("*PIK*") interest accrues at a rate of 4% with respect to loans advanced under the Prepetition Second-Out Loan, with such PIK interest reducing the rate of cash interest otherwise applicable to loans advanced under the Prepetition Second-Out Loan. The annual interest expense under the Prepetition Secured Credit Agreement is approximately $17 million.

19.    All obligations under the Prepetition Secured Credit Agreement are guaranteed by the Prepetition Term Loan Guarantors, all of which are Debtors in these chapter 11 cases. Pursuant to (i) that certain Security Agreement dated as of November 28, 2011, by and among Intermediate Holdings, Holdings, the Prepetition Term Loan Guarantors, the Prepetition Agent (as collateral agent), and the Prepetition Secured Lenders and (ii) that certain Pledge Agreement dated as of November 28, 2011, by and among Intermediate Holdings, Holdings, the Prepetition Term Loan Guarantors, the Prepetition Agent (as collateral agent), and the Prepetition Secured Lenders, the Debtors' obligations under the Prepetition Secured Credit Agreement, including the guarantees thereof, are also secured by first priority perfected security interests in substantially all the Debtors' assets and capital stock and up to 65% of the outstanding capital stock of the Debtors' foreign subsidiaries.[8]  The Prepetition Agent holds such liens, in accordance with the Prepetition Secured Credit Agreement, for the ratable benefit of the Prepetition Secured Lenders. The Prepetition Secured Credit Agreement matures on (i) May 30, 2016 as to the Prepetition First-Out Loan and (ii) November 28, 2016 as to the Prepetition Second-Out Loan.

---

[8]    For tax purposes, the Debtors pledged only 65% of the voting stock of their foreign subsidiaries to secure obligations under the Prepetition Secured Credit Agreement.  The Debtors have only one active foreign subsidiary in Canada, which holds two company owned stores that collectively generate *de minimis* cash flow. All of the Debtors' other foreign operations, including the foreign franchise business, are operated through Sbarro LLC.

B.       **Corporate Structure.**

20.       Sbarro employs all of the Debtors' employees and is responsible for all corporate overhead and support functions, including legal, accounting, marketing, finance, purchasing and information technology activities, and is also party to the vast majority of the Debtors' operating leases, supply agreements, and franchise agreements.   The subsidiary operating entities are generally organized around certain branded restaurant "concepts" (as further described below) and/or to hold certain operating leases or liquor licenses in states that require separate incorporation for such purposes.   A detailed enterprise organizational chart is attached hereto as **Exhibit A**.

21.       The Debtors are predominantly domiciled in New York.   Notably, 23 of the 34 Debtors, including Sbarro LLC, are either incorporated or formed (as limited liability companies) in the state of New York.   The stock certificates for 28 of the Debtors' entities are also held in the Prepetition Agent's vault in Manhattan, New York.   In addition, the Debtors operate several restaurants in Manhattan, New York.

### III.
### Current Businesses and Operations

22.       The Debtors are an Italian QSR concept and the largest shopping-mall focused restaurant concept, with approximately 217 QSR locations and 582 franchised locations.   The Debtors' global QSR and casual dining restaurant brands are organized under two business segments:   (1) the company-owned restaurant segment, which consists of wholly-owned QSRs, casual-dining restaurants, and certain new concept restaurants (the "***Company Segment***"); and (2) the franchise restaurant segment which consists entirely of franchisee-owned domestic and international QSRs (the "***Franchise Segment***").

A.      **Company Segment.**

23.      The Company Segment comprises the Debtors' core domestic QSR business, which includes approximately 217 stores, all located in high pedestrian traffic locations within North America, spanning 39 states in the United States, the District of Columbia, and Canada. The Debtors are currently investing in two new concepts:  Pizza Cucinova, a premium Neapolitan style made-to-order pizza concept, and Brooklyn Fresh, a fast casual Italian concept featuring made-to-order New York style pizza, pasta, and salads.

B.      **Franchise Segment.**

24.      As noted above, the Franchise Segment currently represents a majority of the Debtors' global store base with 582 franchised restaurants, including 176 domestic restaurants and 406 international restaurants.  Internationally, the Debtors partner with experienced local operators who have the infrastructure and resources to grow the brand.  Sbarro's key international markets include Russia, Turkey, the Philippines, Mexico, and India.  Sbarro's international franchises are relatively vibrant, with approximately 60 new international franchises having opened during 2013.

25.      The majority of domestic franchised QSRs are operated by institutional food service companies and restaurant operators that manage entire food courts in high-pedestrian-traffic locations such as airports, universities, and travel plazas.  In addition, Sbarro has a large number of smaller individual franchisees who operate one or two locations, primarily in malls. The Debtors do not provide deficit or any other financing to their franchised restaurants.  The Debtors derive revenues from franchised locations from initial payments and continuing royalty payments based on a percentage of sales.

C.      **Standard Restaurant Operations.**

26.      The Debtors' family-oriented restaurants offer cafeteria and buffet-style quick

service designed to minimize customer waiting time.  The Debtors' various restaurant concepts feature a diverse menu of popular Italian cuisine, including, pizza, pasta dishes, salads, sandwiches, beverages, and desserts that offers a compelling alternative to traditional fast food. The Debtors' entrees generally range in cost between price from $3.29 for a slice of pizza to $7.99 with the average check generally being $8.75 per customer transaction.  Pizza — which is sold predominately by the slice — accounts for just over half of food sales.

27.     The Debtors' approximately 799 company-owned and franchised restaurants are generally open seven days a week for 10-to-12 hours a day.  To ensure that they are able to provide customers with the freshest and highest quality products each day, the Debtors rely on a national distributor and also a network of regional and local food and beverage suppliers to make timely deliveries (multiple times per week, and sometimes daily) to each of the Debtors' restaurants.

28.     The Debtors' lease space and locate their restaurants in high-pedestrian-traffic locations, such as shopping malls, airports, casinos, universities and travel plazas to ensure they reach the greatest number of potential customers.  The Debtors' restaurant locations are relatively concentrated with a handful of major national landlords.  Approximately two-thirds of the Debtors' restaurants are leased with six major landlords, and leases with just two major landlords account for approximately 40% of the Debtors' restaurant base.

29.     The Debtors are current on all of their insurance obligations, with no outstanding amounts due on account of their insurance policies.  The Debtors intend to maintain appropriate insurance coverage during the pendency of the chapter 11 cases.

## IV.
## Events Leading to the Commencement of These Chapter 11 Cases

30.     The Debtors have commenced these chapter 11 cases because they can no longer

14

sustain the amount of their debt obligations under the Prepetition Secured Credit Agreement. The Debtors incurred these obligations at a time when their EBITDA was significantly higher than it is now.   Specifically, the Debtors' EBITDA fell to $15 million in 2012 and under $4 million in 2013, compared to 2011 EBITDA of approximately $22 million (before restructuring charges) and the Debtors' projected EBITDA of approximately $25 million in 2012 and approximately $31 million in 2013 ($30 million and $36 million of adjusted EBITDA, respectively).   As described above, this rapid decline has been driven primarily by reduced mall traffic.   Indeed, mall traffic declined by 1.9% in 2012 and 1.6% in 2013.   This trend has severely impacted restaurant businesses, like the Debtors, that rely on mall food court venues, resulting in negative same store sales in both 2012 and 2013.   With these severe economic headwinds and financial underperformance, as well as a need to obtain additional liquidity and shed a significant number of unprofitable store locations, the Debtors determined they needed a comprehensive restructuring solution.

31.    The Debtors' operational restructuring strategy centers on the need to deleverage their capital structure, optimize their lease portfolio to focus on profitable restaurants and close unprofitable locations, and introduce new concepts to improve the customer experience.   At the beginning of 2014, the Debtors implemented a portfolio optimization plan in order to close underperforming locations and focus on key, profitable restaurants.   To identify "keep" and "close" stores, the Debtors examined multiple factors, including historical financial performance, minimum EBITDA and revenue levels, occupancy costs, same store sales, management, and geographic location.   As a result, the Debtors identified the profitable core restaurants it intends to keep, as well as more than 230 locations to close.[9]   The Debtors closed over 180 unprofitable

---

[9]    The Debtors have also identified approximately 50 profitable stores in less concentrated markets which could be sold to franchises to generate significant cash proceeds.

stores prior to the Petition Date. The Debtors are also working with their landlords to obtain rent reductions on the remaining portfolio. The Debtors' portfolio optimization plan, coupled with the proposed financial restructuring embodied in the Plan, is expected to provide a stable and adequate flow of EBITDA to enable the Debtors to pursue strategies that include new fast casual concepts to optimize the business.

32. Although the Debtors expect to realize the full benefits of these initiatives, forecasting an improvement in EBITDA to $12 million by the end of 2014 and $13 million by 2016, these higher EBITDA levels would still be less than the Debtors' current annual cash interest expense. Moreover, the Debtors have been facing significant liquidity pressure and require additional financing to fund losses and the capital expenditures required to implement their operational restructuring strategy. Finally, commencing these chapter 11 cases is necessary for the Debtors to implement their turnaround strategy, preserve value, and position the company for long-term success.

33. As noted above, in the months prior to the Petition Date, the Debtors engaged in extensive discussions and negotiations with a number of their Prepetition Secured Lenders and the advisors for the Prepetition Agent, which resulted in a fully consensual restructuring solution among the secured lender group. On March 5, 2014, the Debtors began soliciting votes to accept the Plan by distributing copies of the Plan, Disclosure Statement (with exhibits thereto) and ballots to holders of claims entitled to vote on the Plan, namely, holders of claims arising under the Prepetition Secured Credit Agreement. The Debtors established March 8, 2014 as the deadline for the receipt of votes to accept or reject the Plan. An overwhelming majority of the Holders of Claims in Class 3 (the only voting class, which is comprised of Holders of the Prepetition Secured Lender Claims) voted to accept the Plan, with 100% of the Prepetition

Secured Lenders (in dollar amount) returning ballots, and 98% (in dollar amount) voting to

accept the Plan.[10]

34.    The Plan provides for the following treatment of allowed claims against and

interests in the Debtor:

- Administrative Claims will be paid in full in cash on the Effective Date;

- $20 million in loans expected to be outstanding under the proposed debtor in possession credit facility (the "***DIP Facility***") will be converted on a dollar for dollar basis into the Exit Facility or, in the event of a Payout Event, paid in full in cash;

- The Plan incorporates a $35 million credit bid (the "***Credit Bid***") on account of the Prepetition First-Out Loans and any Prepetition Secured Lender Claims. Accordingly, the Plan contemplates that 100% of the equity in Reorganized Holdings (subject to dilution for a management incentive plan) (the "***Prepetition Secured Lender Equity Distribution***") will be distributed to the Holders of Allowed Prepetition Secured Lender Claims in accordance with the waterfall provisions of the Prepetition Secured Loan Documents; provided that each Prepetition Second-Out Lender that votes to accept the Plan shall receive, on account of its Allowed Prepetition Secured Lender Claim arising on account of a Prepetition Second-Out Loan, its *pro rata* share of 2% of the Prepetition Secured Lender Equity Distribution.  If a Payout Event occurs, each Holder of an Allowed Prepetition Secured Lender Claim shall receive its *pro rata* share of the Prepetition Secured Lender Cash Payment, to be distributed in accordance with terms of the waterfall provisions of the Prepetition Secured Loan Documents, provided that each Prepetition Second-Out Lender that votes to accept the Plan shall receive, on account of the portion of its Allowed Prepetition Secured Lender Claim arising from a Prepetition Second-Out Loan, the greater of (i) its *pro rata* share of 2% of any Prepetition Secured Lender Cash Payment and (ii) its *pro rata* share of the Prepetition Secured Lender Cash Payment distributed in accordance with the waterfall provisions of the Prepetition Secured Loan Documents;

- All General Unsecured Claims will be canceled and discharged with no recoveries; and

- All Equity Interests in Sbarro Holdings, Inc. will be extinguished.

35.    Importantly, the Plan expressly contemplates that the Debtors will subject the

---

[10]    This calculation of votes to accept the Plan excludes the votes of insiders.  Only one lender, representing approximately 2% of the Prepetition Secured Claims, voted to reject the Plan.

Plan to an Overbid Process to ensure the Debtors maximize value for their stakeholders. The Plan reflects the reality that, based upon operating performance and cash flow projections, the Debtors' enterprise value is significantly less than the amount of secured debt under the Prepetition Secured Credit Agreement.[11] Indeed, the Debtors do not believe that value goes beyond the allowed Claims of the Prepetition First-Out Lenders and holders of more than a majority in amount of the Prepetition Secured Claims have advised the Debtors that they do not intend to instruct the Prepetition Agent to submit a credit bid greater than the amount of Prepetition First-Out Loans (inclusive of any fees and interest) then outstanding. The Bid Procedures also provide that any bid in excess of the Prepetition First-Out Loans (inclusive of any fees and interest) outstanding must be in cash. Thus, no distributions would be made to any Holders of Claims junior to the Prepetition Secured Lenders upon consummation of the Plan as proposed, unless the Overbid Process results in enhanced creditor recoveries.

36. Although no value is available for General Unsecured Creditors under the Plan, the Debtors believe that the Plan is in the best interests of the Debtors' estates and all stakeholders. The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business, protects the jobs of employees, and preserves business opportunities and important relationships with the Debtors' key vendors and landlords. Further, the Overbid Process incorporated in the Plan contemplates every Holder of a Claim or Interest against the Debtors receiving at least as much value from any winning bid as under the Plan.

---

[11] As noted above, substantially all of the Debtors' assets are subject to valid and perfected liens held by the Prepetition Secured Lenders, which require payment in full before any distributions can be made to general unsecured creditors. For tax purposes, the Debtors pledged only 65% of the voting stock of their foreign subsidiaries to secure obligations under the Prepetition Secured Credit Agreement. However, nearly all of the Debtors' foreign operations, including the foreign franchise business, are operated through Sbarro LLC. There is only one active foreign subsidiary in Canada, which holds two company owned stores that collectively generate de minimis cash flow for the Debtors.

37.    I believe that the Plan will: (a) reduce the Debtors' total funded debt (including interest) by approximately 85%, from approximately $148.2 million as of March 5, 2014 to approximately $20 million under the Exit Facility, assuming (i) the Payout Event does not occur and (ii) the original aggregate principal amount of the DIP Facility is converted into the Exit Facility; (b) allow for the efficient implementation of the Debtors' portfolio optimization plan; and (c) preserve the value of the Debtors' go-forward operations and allow them to further implement their turnaround plan and position the company for long-term success. I further believe that the terms of the Plan, together with the relief sought in the First Day Pleadings, will minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' business operations and ensure the Debtors can maintain a business as usual environment in its remaining stores during the pendency of these chapter 11 cases.

38.    The Debtors have filed these chapter 11 cases to effectuate their proposed restructuring, and expect to emerge expeditiously as a substantially de-leveraged enterprise with a sustainable capital structure and competitive going-forward operations. It is imperative that the Debtors exit chapter 11 quickly and with minimal costs to the Debtors' estates. Contemporaneously herewith, the Debtors filed a motion seeking, among other things, approval of a joint hearing for the Court to consider the adequacy of the Disclosure Statement, approval of the solicitation packages and confirmation of the Plan. The Debtors will seek a joint hearing for approval of the Disclosure Statement and confirmation of the Plan by April 22, 2014, with the goal of emerging from chapter 11 before May 7, 2014.

## V.
## First Day Pleadings

39.    Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings. I believe that, among other things, the relief requested in the First Day Pleadings is

19

necessary to enable the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the pleadings is set forth below.[12]

**A.      Administrative Motions.**

> **(i)      Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "_Joint Administration Motion_").**

40.      The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that this Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Sbarro LLC.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Sbarro LLC to indicate the joint administration of the chapter 11 cases.

41.      The Debtors also seek authority to file the monthly operating reports required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the U.S. Trustee, by consolidating the information required for each debtor in one report that tracks and breaks out all of the specific information, (_e.g._, receipts and disbursements), on a debtor-by-debtor basis in each monthly operating report.

42.      Given the integrated nature of the Debtors' businesses, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in these chapter 11 cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding

---

[12]   Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

43.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**(ii)     Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) Extending the Time to File Statements of Financial Affairs, and (C) Extending the Time, and, Upon Plan Confirmation, Waiving the Requirement, to File Schedules (the "_Creditor Matrix and Schedules and Statements Extension Motion_").**

44.     The Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) extending the time for the Debtors to file their statements of financial affairs (the "*Statements*") for an additional thirty (30) days to a total of forty-four (44) days from the Petition Date, (c) extending the time for the Debtors to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases (the "*Schedules*" and together with the Statements, the "*Schedules and Statements*") through and including May 15, 2014 (the "*Deadline*") so long as confirmation of the Plan shall have occurred on or before such Deadline, and (d) waiving the requirement that the Debtors file the Schedules on the date of confirmation of the Plan if confirmation occurs on or before the Deadline.

45.     My understanding is that the Local Bankruptcy Rules require each debtor to file a list containing the name and address of each creditor.  I believe that permitting the Debtors to

21

maintain a consolidated list of their creditors, in lieu of filing a creditor matrix, is warranted under the circumstances of these chapter 11 cases.

46.    I believe that the Court's grant of an extension of time to file the Schedules and Statements is necessary and appropriate under the circumstances of these prepackaged chapter 11 cases.  The Debtors have thousands of creditors, and the ordinary operation of the Debtors' businesses requires them to maintain voluminous books, records and complex accounting systems.  Accordingly, substantial time would be required for the Debtors and their advisors to complete the Schedules and Statements.  Moreover, no party in interest will be prejudiced by the Court granting the Debtors' request for an extension through and including the Deadline.  The Debtors' major creditor constituencies, the Prepetition Secured Lenders, have voted overwhelmingly to accept the Plan.  All other creditors are either unimpaired and deemed to accept the Plan or are impaired and deemed to reject the Plan and will not receive distributions on account of their prepetition claims or interests.

47.    Further, I believe a waiver of the requirement to file Schedules upon confirmation of the Plan is warranted because the Plan provides for no recovery to unsecured creditors, making a claims reconciliation process moot.  This factor, coupled with the operational and financial burdens of compiling the Schedules, constitute good cause to waive the Debtor's obligation to file the Schedules, subject to confirmation of the Plan on or before the Deadline.

48.    I believe that the relief requested in the Creditor Matrix and Schedules and Statements Extension Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will preserve the assets of the Debtors' estates during the chapter 11 process without prejudice to any party in interest.  Accordingly, I respectfully submit that the Creditor Matrix and Schedules and Statements Extension Motion should be approved.

     **(iii)**    **Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "*Prime Clerk Retention Application*").**

49.    The Debtors seek to retain Prime Clerk LLC ("*Prime Clerk*") as notice and claims agent in these chapter 11 cases. I believe that by retaining Prime Clerk, the Debtors' estates, and particularly their creditors, will benefit from Prime Clerk's services. Prime Clerk specializes in noticing, claims processing and other administrative tasks necessary to operate chapter 11 cases effectively. It is my understanding that Prime Clerk is fully equipped to manage claims issues and provide notice to creditors and other interested parties in these chapter 11 cases and, therefore, I respectfully submit that the Prime Clerk Retention Application should be approved.

     **(iv)**    **Debtors' Motion for Entry of an Order (A) Scheduling an Objection Deadline and Combined Hearing on Debtors' Disclosure Statement and Plan Confirmation, (B) Approving Form and Notice of Confirmation Hearing, (C) Establishing Procedures for Objections to the Disclosure Statement and the Plan, (D) Approving Solicitation Procedures, and (E) Granting Related Relief (the "*Scheduling Motion*").**

50.    As discussed in more detail in the Disclosure Statement and in the Bidding Procedures, the Plan incorporates an overbid process by which potential purchasers or investors may propose an alternative transaction that provides a higher or better recovery to the Debtors' stakeholders than the recovery contemplated by the current proposed Plan. As set forth in the Bidding Procedures, the Debtors will seek preliminary indications of interest with respect to alternative proposals and have set a deadline of April 8, 2014 (the "*Preliminary Interest Deadline*") by which such proposals must be received in order for the Debtors to move forward with a sale process. If the Debtors do not receive preliminary indications of interest by the Preliminary Interest Deadline, the Debtors request that they proceed with Confirmation on the proposed schedule below. If the Debtors do receive preliminary indications of interest by the Preliminary Interest Deadline, the Debtors may adjourn the dates in the proposed schedule in

23

order to give due consideration to potential bidders so as to maximize value for all of the Debtors' stakeholders.

51.     Below is a table highlighting the dates relevant to the Solicitation Procedures and setting forth the Debtors' proposed dates for, among other things, the mailing of the Confirmation Hearing Notice, the Objection Deadline, and the Confirmation Hearing.  Absent the Debtors' receipt of preliminary indications of interest, the Debtors request to proceed on this timeline.

| **Proposed Schedule** | |
| --- | --- |
| Voting Record Date | March 3, 2014 |
| Distribution of Solicitation Package | March 5, 2014 |
| Voting Deadline | March 8, 2014 |
| Petition Date | March 10, 2014 |
| Distribution of Confirmation Hearing Notice | March 11, 2014 |
| Preliminary Interest Deadline | April 8, 2014 |
| Objection Deadline | April 14, 2014 |
| Reply Deadline | April 21, 2014 |
| Confirmation Hearing | April 22, 2014 |

52.     In the Scheduling Motion, the Debtors request entry of an order:  (a) scheduling an objection deadline for objections to the Disclosure Statement and the Plan, including objections to the proposed assumption of Executory Contracts and Unexpired Leases and the proposed Cure Amounts associated therewith (the "***Objection Deadline***"), and scheduling the Confirmation Hearing; (b) establishing procedures for objections to the Disclosure Statement and the Plan; (c) approving the form of the Confirmation Hearing Notice and manner of notice of the

Confirmation Hearing; (d) approving the Solicitation Procedures; and (e) granting related relief.

**B.      Operational Motions Requesting Immediate Relief.**

53.      The Debtors intend to ask for interim and final relief with respect to the following First Day Pleadings and, therefore, will present the motions at the First Day Hearing.

> **(i)      Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (A) Pay Certain Prepetition Wages, Other Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefits Programs (the "_Wages and Benefits Motion_").**

54.      The Debtors request the entry of interim and final orders (i) authorizing the Debtors to (a) pay prepetition wages, salaries and other compensation, taxes, withholdings and related costs and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs and (c) continue their employee medical, insurance and other benefits programs on a postpetition basis, (ii) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing and (iii) scheduling a final hearing to consider entry of the final order.

55.      As of the Petition Date, the Debtors employ approximately 2,700 Employees. Approximately 97 percent, of their Employees are paid on an hourly basis, and the remaining three percent are paid on a salaried basis. The Debtors' workforce is not unionized and none of the Debtors are party to any collective bargaining agreement.[13]

56.      In addition to their employees, the Debtors supplement their workforce by utilizing seven independent contractors (the "_Independent Contractors_"). The Independent

---

[13]    The Debtors operate one store location at the Las Vegas Convention Center under a concession license agreement with Aramark Sports and Entertainment Services, LLC ("_Aramark_"). Under this license agreement the Debtors are required to employ workers at this store location who are members of a union that is party to a collective bargaining agreement with Aramark. The Debtors are not a party to this collective bargaining agreement.

Contractors include individuals who provide certain consulting, real estate, marketing and information technology services for the Debtors. In each case, the Debtors procure the services of the Independent Contractors through individualized contracts that set forth the terms of each Independent Contractor's retention, including remuneration. On occasion, the Debtors also supplement their workforce with temporary employees (the "***Temporary Employees***"). Although the Debtors have paid their wage, salary and other employee obligations (collectively, the "***Employee Obligations***") in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employee Obligations may nevertheless be due and owing.

57.    I believe the majority of the Debtors' Employees, Temporary Employees and Independent Contractors rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. In the absence of such payments, I believe that the Debtors' Employees and Temporary Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations, and, likely, diminishing customer confidence in the Debtors. Moreover, it is my opinion that loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be distracting at a time when the Debtors should be focusing on maintaining their operations. Finally, I believe the Independent Contractors provide consulting, real estate, marketing and information

technology services that are vital to the success Debtors' businesses and it is essential to pay and honor the Independent Contractor Compensation.

58.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

**(ii)     Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Pay (A) Claims Arising Under the Perishable Agricultural Commodities Act, (B) Prepetition Claims of Lien Claimants, and (C) Claims Arising Under Section 503(b)(9) of the Bankruptcy Code and (II) Granting Certain Related Relief (the "_Trade Motion_").**

59.     Pursuant to the Trade Motion, the Debtors are requesting entry of interim and final orders authorizing the Debtors to pay (a) all priority claims arising under section 503(b)(9) of the Bankruptcy Code, (b) all claims of PACA Vendors, and (c) the prepetition claims of Lien Claimants in the ordinary course of business as such claims come due.  The Debtors' ability to operate their businesses and maintain the going-concern value of their businesses depends on the continuous and consistent supply of high-quality food, products, and supplies as well as the maintenance and modernization of the Debtors' restaurants and equipment.  Indeed, the supply chain is the lifeblood of the Debtors' businesses.

60.     The Debtors have reviewed their vendor list carefully and believe that many of the key vendors who make up their supply chain may have claims against the Debtor's estate that are entitled to priority treatment under the Bankruptcy Code or other applicable statutes, but which may nonetheless not be entitled to immediate payment.  Accordingly, by the Trade Motion, the Debtors seek authority to pay the prepetition claims of certain third parties who supply goods or services essential to the Debtors' operations, including claims arising under 503(b)(9) of the Bankruptcy Code, PACA Claims, and Lien Claims.

### A.    503(b)(9) Claims.

61.    In the ordinary course of business, the Debtors rely on various vendors to provide them with the goods necessary to operate their businesses and serve their customers.  I have been advised that certain of these vendors will be entitled to claims with administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods delivered within the twenty-day period prior to the Petition Date.  I am further advised that the Debtors must pay such claims in full to confirm a plan of reorganization, such that the payment of these claims merely affects the timing of such payments, not the amount.  Therefore, the Debtors seek authority to pay the claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business to the extent necessary to preserve the going-concern value of the chapter 11 estates.  As of the Petition Date, the Debtors estimate they owe holders of claims arising under 503(b)(9) approximately $500,000 in the aggregate.

### B.    PACA Vendors.

62.    I am advised that Congress enacted PACA to regulate the sale of perishable agricultural commodities and that PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust ("***PACA Trust***") consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products.  I further understand that assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets, but are not property of the Debtors.

63.    The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodit[ies]" under PACA.  To ensure that the supply

of fresh produce continues unimpeded, it is imperative that the Debtors be authorized to pay all prepetition and postpetition PACA Claims in the ordinary course of business and consistent with their historical practices. As of the Petition Date, the Debtors estimate they owe holders of PACA Claims approximately $190,000 in the aggregate for PACA goods delivered prior to the Petition Date.

## C.    Lien Claimants.

64.    In the ordinary of business, the Debtors engage a number of mechanics and other service providers to repair, maintain and improve the Debtors' store front and restaurant premises. These Lien Claimants are intimately familiar with the layout of the Debtors' restaurants, facilities and equipment and cannot be easily or timely replaced. In addition, the Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens against the Debtors' property for amounts the Debtors owe to the Lien Claimants.

65.    If the Debtors are unable to pay the Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of their businesses, which could immediately and irreparably harm their businesses to the detriment of all stakeholders. Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property or equipment, regardless of whether such Lien Claimants have already perfected their interests. Pursuant to the Trade Motion, the Debtors request authority to pay up to $2,000 on account of Lien Claims.

66.    I believe that the relief requested in the Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption and will ensure the value of

the Debtors' businesses as a going concern are preserved during the pendency of these chapter

11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Trade Motion

should be approved.

        **(iii)**       **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Maintain, Administer, Modify and Renew Customer Programs, Promotions and Practices and to Honor Prepetition Obligations Related Thereto (the "_Customer Programs Motion_").**

67.     The Debtors request entry of interim and final orders authorizing the Debtors to

maintain, administer, replace and renew their customer programs, promotions and practices and

to pay and otherwise honor their obligations related thereto in the ordinary course of business

consistent with past practice.

68.     The Debtors have developed their brands and designed various marketing

strategies to generate business in the face of sophisticated competition. Among these strategies

are certain customer programs, promotions and practices (collectively, the "**Customer**

**Programs**") designed to enhance revenues by, among other things, encouraging repeat business

and developing new customer relationships.

69.     As more fully described in the Customer Programs Motion, the Debtors'

Customer Programs include the following programs.

- *Customer Gift Card Program*. Among the Debtors' Customer Programs is a customer gift card and gift certificate program (the "*Gift Card Program*"). Customers purchase gift cards or gift certificates at store locations for cash or credit in any denomination. As of the Petition Date, approximately $87,500 of total prepaid liabilities remained outstanding on account of the Gift Card Program. The Debtors seek authority to continue to administer the Gift Card Program in the ordinary course of business and to pay prepetition obligations related thereto.

- *Mall employee discounts*. The Debtors maintain discount programs for employees at shopping malls where the Debtors have a QSR Location. The Debtors believe that

30

they issued discounts of approximately $100,000 per month to shopping mall employees in 2013.

- ***Promotional discounts and coupons***.  From time to time in the ordinary course of business, the Debtors offer sales promotions of various kinds at the Debtors' restaurant locations to generate sales volume.  The Debtors believe that they have issued promotional discounts for the purchase of a whole pizza pie of approximately $62,000 per month in 2013.  The Debtors also offer coupon-based promotions that customers may redeem at store locations.  Total coupon redemptions averaged approximately $2,000 per month in 2013.

- ***Travel customer promotions.***  The Debtors accept vouchers issued by air carriers that allow passengers the ability to have portions of their airport QSR Location purchases paid for by the carriers.  The Debtors also accept vouchers issued to guests of casinos for meals at casino QSR Locations.  In addition, the Debtors provide meals to customers of bus tour companies in New York City and Washington, D.C., after which the Debtors are compensated by the tour companies via corporate credit card or check.  Together, these travel-oriented Promotional Programs averaged approximately $70,000 per month in sales in 2013.

- ***University program***.  The Debtors maintain a program with various universities throughout the United States whereby students can use university dining points to purchase food from Sbarro stores located on or around university campuses.  Once a month, the universities remit a payment to Sbarro for the dollar value of those university dining points, at a discounted rate, used at the stores.  The Debtors believe that university Promotional Programs averaged approximately $28,000 per month in sales in 2013 for university stores currently open.

- ***Sbarro Reward E-Club***.  The Sbarro E-Club is an email marketing program that enables the Debtors to increase engagement with customers through regular communications about product news and special offers.  The Debtors believe that total promotional discounts associated with the Sbarro E-Club averaged approximately $3,600 per month in 2013.

70.     The Debtors request authority pursuant to the interim and final orders to maintain and administer the Customer Programs and to pay prepetition obligations related thereto in the ordinary course of business and in a manner consistent with past practice.  The Debtors will suffer immediate and irreparable harm absent the authority requested pursuant to the interim order.

71.     In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill, and support of their Customers, the Debtors must maintain their Customer

Programs in the ordinary course of business and honor their obligations thereunder.  I believe that maintaining the Customer Programs will encourage the Debtors' Customers to continue to purchase the Debtors' products and, ultimately, lead to increased revenue.

**(iv)     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Taxes and Fees (the "_Taxes and Fees Motion_").**

72.     The Debtors request the entry of interim and final orders granting the Debtors the authority to pay any Taxes and Fees that accrued or arose in the ordinary course of business prior to the Petition Date.  In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens or seek to lift the automatic stay.  In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

73.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

      **(v)**     **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Provide Postpetition Intercompany Claims Administrative Expense Priority (the "*Cash Management Motion*").**

74.     The Debtors request entry of interim and final orders authorizing the Debtors to (a) continue using their existing cash management system, bank accounts and business forms, (b) continue performing ordinary course intercompany transactions and (c) provide postpetition intercompany claims administrative expense priority.

75.     In addition, the Debtors further request that this Court authorize and direct the Debtors' Banks to: (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

76.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer and disburse funds generated by their operations. The Cash Management System is specifically tailored to meet the Debtors' current operating needs, enabling the Debtors to centrally control and monitor corporate funds and available cash, as well as to keep accurate account balances and presentment information.

77.     In the ordinary course of business, from time to time, transfers of funds between Debtors and, on occasion, between Debtors and non-debtor affiliates (the "*Intercompany Transactions*") may result in intercompany receivables and payables

(the "**Intercompany Claims**").  The Debtors track all Intercompany Transactions electronically through their accounting system and can ascertain, trace, and account for such claims as needed.

78.    Events that may give rise to Intercompany Claims are infrequent, but include (or have historically included) the following activities:

- Deficit Funding.  Managers in the Accounting Department at Sbarro LLC can authorize the transfer of funds between the Sbarro LLC Concentration Account and the Operating Accounts of other Concepts as necessary and appropriate to address temporary cash shortcomings at other Concepts.  In addition, during certain periods of short duration when book transfers are unavailable (*e.g.*, holiday seasons), Sbarro LLC may pay vendors on behalf of other Concepts directly from Sbarro LLC accounts.  On such occasions, an Intercompany Claim arises until the Concept can reimburse Sbarro LLC for the payment made on its behalf.

- Joint Venture Loans.  On certain occasions, the Debtors have advanced funds to their domestic, non-debtor, joint venture entity (the "**Joint Venture**") from the Sbarro LLC Concentration Account to meet Joint Venture capital expenditure needs.  The Debtors' have developed the Joint Venture to enter markets for which partner expertise or special access to real estate are necessary.  As Joint Venture operations produce excess cash, managers in the Accounting Department initiate book transfers from the Joint Venture to satisfy outstanding Intercompany Claims.  As of the Petition Date, the Debtors have recorded receivables from the Joint Venture for capital expenditure advances and losses totaling approximately $130,000.

79.    Management and administrative functions of the Cash Management System are integrated among the Debtors, and managers in the Accounting Department also manage the Non-Debtor Accounts.    The continued performance of ordinary-course Intercompany Transactions and related functions is necessary to ensure the Debtors' ability to operate their business as debtors in possession.  Thus, if the Debtors were unable to continue entering into Intercompany Transactions as needed, the Debtors' business could be unnecessarily harmed to the detriment of the estates' creditors.

80.    To ensure, however, that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to

sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor or a non-Debtor affiliate arising after the Petition Date, as a result of ordinary course Intercompany Transactions pursuant to the Cash Management System, be accorded administrative priority expense status.

81.    If the Debtors were required to open separate accounts as debtors in possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, it would necessitate opening new accounts for collections, cash concentration and disbursements. In fact, the Debtors would need to open dozens of new bank accounts. Thus, the Debtors' treasury, accounting and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Debtors' chapter 11 cases. The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow. Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments and implementing new information technology protocols would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

82.    Replacing the Debtors' present system of bank accounts would also complicate the use of the RECONNET System. The RECONNET System is an enterprise software system that permits managers in the Debtors' Accounting Department to closely monitor cash deposits into the Debtors' accounts, as well as to identify and address irregularities that may arise. The RECONNET System is a critical element of the Cash Management System that the Accounting Department relies upon on a regular basis. Closing old accounts and opening new ones may disable the effectiveness of the RECONNET System for some period of time to the detriment of

35

the Debtors' estates.

83.    Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, all as generally would be required by the U.S. Trustee Guidelines.

84.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into these chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of postpetition debts and providing important internal controls.  I believe that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date. Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of prepetition debts, including prepetition intercompany debts, without the prior approval of appropriate managers.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

85.    Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful reorganization of the Debtors' businesses.  I believe that it the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption.

**(vi)** **Debtors' Motion for Entry of Interim and Final Orders Establishing
Notification and Hearing Procedures for Certain Transfers of Common
Stock (the "_Equity Trading Motion_").**

86.     The Debtors request entry of interim and final orders (a) approving certain
notification and hearing procedures regarding certain transfers of the common stock of Sbarro
Holdings, Inc. or any Beneficial Ownership therein (the "**_Common Stock_**"); and (b) finding that
any purchase, sale or other transfer of Common Stock in violation of the Procedures shall be null
and void _ab initio_.

87.     As of the Petition Date, the Debtors estimate that they have NOLs in the amount
of approximately $43.8 million.  Based on a combined federal and state income tax rate of
approximately 40 percent, the NOLs could translate into a potential future tax savings of
approximately $17.5 million.  The NOLs are of significant value to the Debtors and their estates
because the Debtors can carry forward their NOLs to offset their future taxable income for up to
20 taxable years, thereby reducing their future aggregate tax obligations.  In addition, such NOLs
may be utilized by the Debtors to offset any taxable income generated by transactions completed
during these chapter 11 cases.

88.     Section 382 of the IRC limits the amount of taxable income that can be offset by a
corporation's NOLs in taxable years (or a portion thereof) following an ownership change.
Thus, certain transfers of Common Stock effected before the effective date of the Debtors'
emergence from chapter 11 protection may trigger an "ownership change" for IRC purposes,
severely endangering the Debtors' ability to utilize the NOLs and causing substantial damage to
the Debtors' estates.  To maximize the use of their NOLs and enhance recoveries for the
Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor
certain transfers of Common Stock so as to be in a position to act expeditiously to prevent such
transfers, if necessary, with the purpose of preserving the NOLs.

C.      **Motions Requesting Relief at a Later Hearing.**

89.      Contemporaneously herewith, the Debtors have filed a number of pleadings for which they do not intend to seek interim relief at the First Day Hearing.

(vii)    **Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "_Utilities Motion_").**

90.      The Debtors request the entry of an order:  (a) determining that their Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures whereby Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance.

91.      In the ordinary course of their businesses, the Debtors incur utility expenses for water, electricity, natural gas, local and long-distance telecommunications service, data service, waste management and other similar utility services.  Approximately 180 Utility Providers provide these services.  I believe that uninterrupted utility services are essential to the Debtors' ongoing operations.  Additionally, any interruption of utility services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.

92.      I believe and I am advised that the proposed procedures are necessary in these chapter 11 cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers for adequate security in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, absent the relief

sought in the Utilities Motions, a Utility Provider could blindside the Debtors by unilaterally deciding — on or after the 30th day following the Petition Date — that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put these chapter 11 cases in jeopardy.

93.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

### (viii)    Debtors' Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Nonresidential Real Property Leases and Abandonment of Certain Real Property Effective as of the Petition Date (the "*Lease Rejection Motion*").

94.    Pursuant to the Lease Rejection Motion, the Debtors are seeking authority to reject certain Leases, effective as of the Petition Date, and abandon certain personal property located in the leased premises.  Prior to the Petition Date, the Debtors were tenants under approximately 400 nonresidential real property leases across the United States.

95.    The Debtors began the process of reviewing and analyzing their extensive lease portfolio and the performance of each of its stores several months prior to the Petition Date.  In connection therewith, the Debtors determined, in their business judgment, that the closure of numerous underperforming stores would be in their best interests.  Accordingly, the Debtors closed 183 stores prior to the Petition Date, (the "*Leased Premises*") and did not renew the leases on an additional nine stores which expired prior to the Petition Date.  The Debtors vacated the premises of all 192 closed stores.  By the Lease Rejection Motion the Debtors seek to reject the Leases associated with the Leased Premises.

39

96.     Because the Debtors no longer maintain operational stores at the Leased Premises, continued compliance with the terms of the Leases would be burdensome and would provide no corresponding benefit to the Debtors, their estates, or the stakeholders in these chapter 11 cases. Notably, as of the Petition Date, the Debtors continue to be obligated to pay rent under the Leases even though they have ceased operations at the respective premises, and also are required to pay for certain property taxes, utilities, insurance and other related charges associated with the Leases.  By rejecting the Leases, the Debtors estimate that they will be able to achieve cost savings of approximately $80.8 million in rent and other related obligations over the remaining terms of the Leases.  Therefore, immediate rejection of the Leases will prevent the estates from potentially incurring unnecessary administrative expenses associated with the Debtors' obligations under the Leases.

97.     I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors' estates and maximize the value of the Debtors' estates and eliminate operating losses associated therewith.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be approved.

**(ix)    Debtors' Motion for Entry of an Order Authorizing and Approving Expedited Procedures to Reject Unexpired Leases (the "_Rejection Procedures Motion_").**

98.     The Debtors seek authority and approval of expedited procedures to reject unexpired leases and the abandonment of certain personal property.  The Debtors are parties to hundreds of unexpired leases, including real property leases for their store locations.  The Debtors have undertaken a review of the Leases and will assume certain Leases in connection with the administration of these chapter 11 cases, but in light of the need to close many underperforming stores, there will be a large number of Leases that no longer provide any benefit to their estates and should be rejected.  The Debtors have identified a number of such Leases and

40

have filed the Lease Rejection Motion to reject such Leases.  As the Debtors continue to review

their portfolio of Leases they may seek to reject additional Leases.  Consistent with the practice

in large debtor-retailer chapter 11 cases, and in an effort to conserve the resources of these

estates, the Debtors seek approval of the following procedures to facilitate an expeditious and

efficient process for rejecting burdensome Leases:

<blockquote>

a.  <u>Rejection Notice</u>.  The Debtors will file a notice (the "***Rejection Notice***")
to reject a Lease or Leases pursuant to section 365 of the Bankruptcy
Code, which Rejection Notice shall set forth, among other things:  (i) the
Lease(s) to be rejected; (ii) the names and addresses of the counterparties
to such Lease(s); (iii) the remaining term of the Lease; (iv) the effective
date of the rejection for each such Lease(s), which date may not be before
the date of service of the Rejection Notice (the "Rejection Date"); and (v)
the deadlines and procedures for filing objections to the Rejection Notice
(as set forth below).

b.  <u>Service of the Rejection Notice</u>.  The Debtors will serve the Rejection
Notice (i) by an overnight delivery service upon the Lease counterparties
or landlords affected by the Rejection Notice; and (ii) by email or fax
upon: (a) the Office of the United States Trustee for the Southern District
of New York (the "***U.S. Trustee***"); (b) counsel to the agent for the
Debtors' proposed postpetition secured lenders and prepetition secured
lenders; (c) counsel to any statutory committee of unsecured creditors
appointed in these chapter 11 cases (the "Committee"), and until such
appointment, the entities listed on the Consolidated List of Creditors
Holding the 30 Largest Unsecured Claims filed pursuant to Rule 1007(d)
of the Bankruptcy Rules; and (d) those parties requesting notice pursuant
to Bankruptcy Rule 2002.

c.  <u>Objection Procedures</u>.  Parties objecting to a proposed rejection must file
and serve a written objection so that such objection is filed with this Court
and is actually received by the following parties (collectively, the
"***Objection Service Parties***") no later than ten (10) calendar days after the
date the Debtors serve the relevant Rejection Notice:  (a) counsel to the
Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York,
New York 10022, Attn: Nicole L. Greenblatt, Esq., David S. Meyer, Esq.
and Lauren Kanzer; (b) the U.S. Trustee, U.S. Federal Office Building,
201 Varick Street, Suite 1006, New York, New York 10014, Attn: Paul K.
Schwartzberg;  (c) counsel to the agent for the Debtors' proposed
postpetition secured lenders and prepetition secured lenders, Milbank,
Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York,
New York, 10005, Attn: Evan Fleck, Esq. and Brian Sturm, Esq.; (d)
counsel to the Committee, if appointed; and (e) those persons who have

</blockquote>

formally appeared and requested service in this proceeding pursuant to Bankruptcy Rule 2002.

d.  <u>Event of No Objection</u>.  If no objection to a Rejection Notice is timely filed and served, the rejection of such Lease(s), shall be deemed effective on the date set forth in the Rejection Notice, or if no such date is set forth, the Rejection Date; provided, however, notwithstanding the foregoing, that the Debtors may, in their sole discretion, file with the Court a certificate of no objection with a proposed order rejecting such Lease(s).

e.  <u>Timely Objection</u>.  If a timely objection to a Rejection Notice is filed and received in accordance with the Rejection Procedures, the Debtors shall schedule a hearing on such objection and shall provide at least five (5) days' notice of such hearing to the objecting party and the Objection Service Parties.   If the Court ultimately upholds the Debtors' determination to reject the applicable Lease, then the applicable Lease shall be deemed rejected (a) as of the Rejection Date, or (b) as otherwise determined by the Court as set forth in any order overruling such objection.

f.  <u>Proofs of Claim</u>.  Claims arising out of the rejection of Leases, if any, must be filed, on or before the later of (a) the deadline for filing proofs of claim established in the chapter 11 cases, if any, and (b) thirty (30) days after the Rejection Date.  If no proof of claim is timely filed, such claimant shall be forever barred from asserting a claim for rejection damages and from participating in any distributions that may be made in connection with these chapter 11 cases.

g.  <u>Deposits</u>.  If the Debtors have deposited funds with a Lease counterparty as a security deposit or other arrangement, such Lease counterparty may not setoff or otherwise use such deposit without the prior authority of the Court or agreement of the parties.

99.    The above proposed Rejection Procedures will streamline the Debtors' ability to reject burdensome Leases, and thereby minimize unnecessary post-petition obligations, while also providing Lease counterparties with adequate notice of the rejection of any such Lease and an opportunity to object to such rejection within a reasonable time period.

100.    Accordingly, I respectfully submit that the Rejection Procedures should be approved as they balance the respective interests of the parties, are an appropriate exercise of the Debtors' business judgment, and constitute a common form of relief in many bankruptcy cases in

this and other jurisdictions.

**D.     Retention Related Pleading.**

101.     Contemporaneously herewith, the Debtors have also filed an application related to the retention of Prime Clerk as administrative advisor.  The Debtors intend to present this application for hearing at a Hearing subsequent to the First Day Hearing.

**(x)     Debtors' Application for an Order Authorizing Employment and Retention of Prime Clerk LLC as Administrative Advisor *Nunc Pro Tunc* to the Petition Date (the "*Prime Clerk Administrative Advisor Application*")**

102.     The Debtors seek to retain Prime Clerk as administrative advisor in these chapter 11 cases.  I believe that by retaining Prime Clerk, the Debtors' estates, and particularly their creditors, will benefit from Prime Clerk's services.  Prime Clerk specializes in solicitation, balloting and other administrative tasks necessary to operate chapter 11 cases effectively.  It is my understanding that Prime Clerk is fully equipped to assist in the preparation of the schedules of assets and liabilities and solicit, ballot, and tabulate votes as required in support of confirmation of a chapter 11 plan in these chapter 11 cases and, therefore, I respectfully submit that the Prime Clerk Administrative Advisor Retention Application should be approved.

**VI.**
**Local Bankruptcy Rule 1007-2 Disclosures**

103.     Local Bankruptcy Rule 1007-2 required that certain information about the Debtors be provided in this Declaration.  To the extent applicable to the Debtors, the required information is provided in the schedules attached hereto as **Exhibit B**.  Specifically, the schedules attached to **Exhibit B** contain the following information with respect to the Debtors:[14]

---

[14]  The information contained in the schedules attached to **Exhibit B** of this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  Unless otherwise indicated, the financial information contained in the schedules is unaudited.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and

- <u>Schedule 1</u>.  Schedule 1 sets forth a list of the names and addresses and, where available, telephone numbers of the creditors holding the 30 largest unsecured claims against the Debtors (on a consolidated basis), excluding insiders, and (where available) the name of the person familiar with the Debtors' account.  This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent, unliquidated, disputed or partially secured, subject to the Debtors' rights to dispute the validity of any claims.

- <u>Schedule 2</u>.  Schedule 2 sets forth a list of the names and addresses of the creditors holding the five largest secured claims against the Debtors (on a consolidated basis).  This list also includes the amount of each claim, a brief description of the type of collateral securing the claim, and whether the claim or lien is disputed, subject to the Debtors' rights to dispute the validity of any claims. The value of the collateral securing these claims remains undetermined.

- <u>Schedule 3</u>.  Schedule 3 sets forth a summary of the assets and liabilities of the Debtors on a consolidated basis, as of the Petition Date, which has not been audited and is subject to change.

- <u>Schedule 4</u>.  Schedule 4 lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of holders thereof.

- <u>Schedule 5</u>.  Schedule 5 sets forth a list of the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor (other than bank accounts which may be subject to claims or setoff), or agent for any such entity.

- <u>Schedule 6</u>.  Schedule 6 sets forth a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

- <u>Schedule 7</u>.  Schedule 7 sets forth a list of the locations of the Debtors' substantial assets and books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

- <u>Schedule 8</u>.  Schedule 8 sets forth a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property, where a judgment against the Debtors or a seizure of their property may be imminent.

- <u>Schedule 9</u>.  Schedule 9 sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

---

legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in preceding paragraphs of this Declaration.

- **Schedule 10**.  Schedule 10 sets forth a list identifying the estimated amount of the gross weekly payroll to employees (exclusive of officers and directors) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants retained by the Debtors, for the thirty-day period following the filing of the Debtors' chapter 11 petitions.

- **Schedule 11**.  Schedule 11 sets forth a list a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the filing of the Debtors' chapter 11 petitions.

104.    Notwithstanding anything in this Declaration or on any of the exhibits attached hereto to the contrary, nothing contained in this Declaration or on any of the exhibits or schedules attached hereto is intended to be, or should be deemed or construed as, an admission with respect to:  (a) the liability for, the amount of, the enforceability of or the validity of any claim; (b) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim; or (c) the proper characterization of any transaction or financing as a sale or financing.  The Debtors specifically reserve the right to challenge any claim or any transaction or any alleged security for any claim on any and bases.

### Conclusion

105.    To minimize any loss of value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of these chapter 11 cases with as little interruption to the Debtors' operations as possible.  If this Court grants the relief requested in the First Day Pleadings, the prospect of achieving these objectives — to the maximum benefit of the Debtors' estates, creditors and parties in interest — will be substantially enhanced.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 10, 2014
        New York, New York

*/s/ Carolyn Spatafora*

Carolyn Spatafora

*Chief Financial Officer of Sbarro LLC*

# EXHIBIT A

**Corporate Structure**



Sbarro LLC Corporate Structure

## **EXHIBIT B**

**Local Bankruptcy Rule 1007-2 Schedules**

## SCHEDULE 1

### Consolidated List of the Holders of the 30 Largest Unsecured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the 30 largest unsecured creditors (the "***Consolidated List***") for all of the Debtors, which is based on the Debtors' books and records as of the Petition Date. The Consolidated List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (a) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (b) secured creditors, including any unsecured deficiency claims. None of the claims in the Consolidated List are contingent, unliquidated, disputed, or partially secured.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| 1 | VISTAR CORPORATION VISTAR DISTRIBUTION CENTERS 12650 EAST ARAPAHOE ROAD, BUILDING D CENTENNIAL, CO 80112-3901 FAX: (303) 662-7500 PHONE: (303) 662-7234 | Trade | | $536,516 |
| 2 | 421 SEVENTH AVENUE, LLC RE:RENT 421 SEVENTH AVENUE, 15TH FLOOR NEW YORK, NY 10001 EMAIL: info@aagmanagement.com FAX: (212) 564-7512 PHONE: (212) 564-7250 | Lease | | $210,040 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (bond debt, trade debt, bank loan, government contracts, etc.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM (if secured, also state value of security) |
|---|---|---|---|---|
| 3 | 1604-1610 BROADWAY OWNER LLC SL GREEN REALTY CORP. 420 LEXINGTON AVENUE, S# 1800 NEW YORK, NY 10170  EMAIL: sweiss@ngkf.com PHONE: (212) 372-2000 | Lease | | $122,008 |
| 4 | ANNAPOLIS MALL OWNER LLC ATTN: GENERAL COUNSEL 11601 WILSHIRE BLVD, 11TH FLOOR LOS ANGELES, CA 90025  EMAIL: jernest@us.westfield.com FAX: (310) 478-1267 PHONE: (410) 266-5432 | Lease | | $113,983 |
| 5 | QUEENS CENTER REIT LLC QUEENS CENTER SPE LLC 401 WILSHIRE BOULEVARD SANTA MONICA, CA 90401  FAX: (310) 395-2791 PHONE: (310) 394-6000 | Lease | | $87,600 |
| 6 | THE RETAIL PROPERTY TRUST PROPERTY ID 77 4827 P.O. BOX 35461 NEWARK, NJ 07193  FAX: (404) 233-7868 PHONE: (404) 263-2313 | Lease | | $81,735 |
| 7 | WESTFIELD GARDEN STATE LLC GARDEN STATE PLAZA, L.P. FILE #56816 LOS ANGELES, CA 90074-6816  FAX: (201) 843-1716 PHONE: (201) 843-2121 | Lease | | $80,778 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| 8 | RCS REAL ESTATE ADVISORS<br>ATTN: GENERAL COUNSEL<br>460 WEST 34TH STREET<br>NEW YORK, NY 10121<br><br>FAX: 212 268 5484<br>PHONE: 212 239 1100 | Trade | | $79,858 |
| 9 | PEPSI COLA COMPANY<br>ATTN: GENERAL COUNSEL<br>555 WEST MONROE STREET<br>CHICAGO, IL 60661<br><br>EMAIL: pepsicomediarelations@pepsico.com<br>FAX: (312) 821-2953<br>PHONE: (312) 821-1000 | Trade | | $78,016 |
| 10 | AVENUES MALL, LLC<br>THE AVENUES<br>225 W. WASHINGTON STREET<br>INDIANAPOLIS, IN 46204<br><br>EMAIL: Simon-8087@simon.com<br>FAX: (317) 685-7222<br>PHONE: (317) 263-7954 | Lease | | $74,711 |
| 11 | HG GALLERIA I,II,III,LP<br>C/O SIMON PROPERTY GROUP INC.<br>225 W. WASHINGTON STREET<br>INDIANAPOLIS, IN 46204<br><br>EMAIL: Simon-7621@simon.com<br>FAX: (317) 685-7222<br>PHONE: (317) 263-7954 | Lease | | $72,237 |
| 12 | SOL GOLDMAN INVESTMENTS, LLC<br>ATTN: GENERAL COUNSEL<br>640 FIFTH AVE., THIRD FLOOR<br>NEW YORK, NY 10019<br><br>FAX: (212) 582-0186<br>PHONE: (212) 265-2280 | Lease | | $72,181 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (bond debt, trade debt, bank loan, government contracts, etc.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM (if secured, also state value of security) |
|---|---|---|---|---|
| 13 | WOODFIELD MALL LLC ATTN: GENERAL COUNSEL 225 WEST WASHINGTON STREET INDIANAPOLIS, IN 46204 EMAIL: Simon-5037@simon.com FAX: (317) 685-7222 PHONE: (317) 636-1600 | Lease | | $71,972 |
| 14 | COLUMBIA MALL, INC THE MALL IN COLUMBIA 110 N. WACKER DRIVE CHICAGO, IL 60606 FAX: (312) 442-6374 PHONE: (410) 992-6595 | Lease Rejection | Unliquidated | $68,814 |
| 15 | MALL AT SMITH HAVEN LLC SMITH HAVEN MALL 225 WEST WASHINGTON STREET INDIANAPOLIS, IN 46204 EMAIL: customercare@simon.com FAX: (317) 685-7222 PHONE: (317) 636-1600 | Lease | | $68,508 |
| 16 | NORSAN NETWORK SERVICES INC NETWOLVES 4710 EISENHOWER BLVD. TAMPA, FL 33634-6337 EMAIL: ir@moodys.com FAX: (800) 325-3740 PHONE: (763) 553-3415 | Trade | | $67,568 |
| 17 | GGP LIMITED PARTNERSHIP ROUSE-PROVIDENCE, LLC 110 NORTH WACKER DRIVE CHICAGO, IL 60606 FAX: (312) 960-5475 PHONE: (312) 960-5000 | Lease Rejection | Unliquidated | $67,136 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (bond debt, trade debt, bank loan, government contracts, etc.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM (if secured, also state value of security) |
|---|---|---|---|---|
| 18 | STANDARD & POOR'S ATTN: GENERAL COUNSEL 55 WATER STREET NEW YORK, NY 10041 FAX: (212) 438-6726 PHONE: (212) 438-1000 | Trade | | $62,000 |
| 19 | UNION STATION INVESTCO JONES LANG LASALLE AMERICA INC 40 MASSACHUSETTS AVENUE NE SECOND FLOOR WEST WASHINGTON, DC 20002-4225 EMAIL: jaguilera@unionstationdc.com FAX: (202) 719 5001 | Tax | | $61,968 |
| 20 | SCOTTSDALE FASHION SQUARE DEPT. SFSRET P.O. BOX 52623 PHOENIX, AZ 85072-2623 EMAIL: scottsdalefashionsquare.salesreporting@macerich.com FAX: (480) 423-1455 PHONE: (480) 990-7800 | Lease | | $61,804 |
| 21 | WEST FARMS MALL, LLC DEPARTMENT 55501 P.O. BOX 67000 DETROIT, MI 48267-0555 EMAIL: jnieves@taubman.com FAX: (860) 521-8682 PHONE: (860) 561-3024 | Lease | | $60,227 |
| 22 | MADISON/FIFTH ASSOCIATES LLC c/o THE STAHL ORGANIZATION 277 PARK AVENUE NEW YORK, NY 10172 EMAIL: simon-3632@simon.com | Trade | | $55,833 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| 23 | MCARTHUR SHOPPING CENTER LLC C/O THE TAUBMAN COMPANY LLC 200 EAST LONG LAKE ROAD BLOOMFIELD HILLS, MI 48304<br><br>EMAIL: macreporting@taubman.com FAX: (248) 258-7596 PHONE: (248) 258-7466 | Lease Rejection | Unliquidated | $55,816 |
| 24 | TAUBMAN AUBURN HILLS ASSOC.LP RE:GREAT LAKES CROSSING DEPT. 124501 P.O. BOX 67000 DETROIT, MI 48267-1245<br><br>EMAIL: bbaker@taubman.com FAX: (248) 258-7683 PHONE: (248) 258-7248 | Lease | | $55,794 |
| 25 | THE MACERICH PARTNERSHIP, L.P. BROOKLYN KINGS PLAZA LLC 401 WILSHIRE BOULEVARD SANTA MONICA, CA 90401<br><br>EMAIL: kingsplaza.salesreporting@macerich.com PHONE: (804) 794-4662 | Lease | | $55,621 |
| 26 | TJ PALM BEACH ASSOCIATES DEPARTMENT 176401 P.O. BOX 67000 DETROIT, MI 48267-1764<br><br>FAX: (248) 258-7683 PHONE: (248) 258-7283 | Lease | | $55,072 |
| 27 | FORBES/COHEN PROPERTIES FORBES/COHEN PROPERTIES 100 GALLERIA OFFICENTRE SUITE 427 SOUTHFIELD, MI 48034-4780<br><br>EMAIL: plamb@theforbescompany.com | Lease | | $54,807 |

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| 28 | TAUBMAN-CHERRY CREEK L.P. DEPARTMENT 89801 P.O. BOX 67000 DETROIT, MI 48267-0523<br><br>EMAIL: cherrycreeksalesreports@taubman.com FAX: (248) 258-7683 PHONE: (248) 258-7283 | Lease Rejection | Unliquidated | $53,848 |
| 29 | EKLECCO NEWCO LLC C/O PYRAMID COMPANIES ATTN: LEIGH COSTELLO 4 CLINTON SQUARE SYRACUSE, NY 13202<br><br>FAX: (315) 422-2717 PHONE: (315) 422-7000 | Trade | | $52,914 |
| 30 | MOODY'S SERVICE ATTN: GENERAL COUNSEL 2501 GRESHAM ST SEBRING, FL 33875<br><br>FAX: (863) 655-1316 PHONE: (863) 655-5500 | Trade | | $52,500 |

## SCHEDULE 2

### Consolidated List of the Holders of the Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date. The Debtors currently have only one creditor holding a secured claim.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor Name and Address | Amount of Claim | Collateral Description and Value |
|---|---|---|
| 1.  Agent to the Prepetition Secured Credit Agreement<br>Cantor Fitzgerald<br>499 Park Avenue<br>New York, New York 10022<br>Attn:  Nils Horning, Esq., and John Stelwagon | $148,171,676 | First priority perfected security interests in substantially all the Debtors' assets and capital stock and up to 65% of the outstanding capital stock of the Debtors' foreign subsidiaries. |

## SCHEDULE 3

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

**Total Assets (Book Value)**:          $175,446,687
**Total Liabilities**:          $165,234,168

## SCHEDULE 4

### Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

The outstanding common stock of Sbarro Holdings, Inc. is privately held and there is no established public trading market for the common stock.

The outstanding funded debt that certain Credit Agreement dated as of November 28, 2011, by and among New Sbarro Intermediate Holdings, Inc., as borrower, New Sbarro Finance, Inc. and certain of Holdings' subsidiaries (excluding, among other entities, joint ventures), as guarantors, Cantor Fitzgerald Securities, as administrative agent and collateral agent, and certain lenders from time to time party thereto is privately held and there is no established public trading market for the funded debt.

# SCHEDULE 5

## Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

| Property | Entity Holding Property |
| --- | --- |
| Various Security Deposits | Certain of the Debtors' lessors, utility companies, regulatory agencies and others. |
| Various Other Assets | Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical if not impossible. |

## SCHEDULE 6

### Debtors' Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| 401 Broadhollow Road<br>Melville, New York 11747 | Corporate Headquarters | Leased |
| 33rd & Seventh<br>159 West 33rd Street<br>New York, New York 10001 | Restaurant | Leased |
| 34th Street<br>22 West 34th Street<br>New York, New York 10001 | Restaurant | Leased |
| 49th Street & Broadway<br>1606 Broadway, #897<br>New York, New York 10019 | Restaurant | Leased |
| Ala Moana<br>1450 Ala Moana Boulevard<br>Honolulu, Hawaii 96814 | Restaurant | Leased |
| Anchorage Shopping Center<br>2800 Leavenworth Street<br>San Francisco, CA 94133 | Restaurant | Leased |
| Amimas Valley Mall<br>4601 East Main Street<br>Farmington, New Mexico 87402 | Restaurant | Leased |
| Annapolis Mall<br>1445 Annapolis Mall<br>Annapolis, Maryland 21401 | Restaurant | Leased |
| Annapolis Mall<br>1062 Annapolis Mall<br>Annapolis, Maryland 21401 | Restaurant | Leased |
| Arbor Place<br>6700 Douglas Boulevard<br>Douglasville, Georgia 30135<br>Space Id: FC-1 | Restaurant | Leased |
| Arden Fair<br>1689 Arden Way<br>Sacramento, California 95815 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Arrowhead Town Center<br>7700 West Arrowhead Towne<br>Glendale, Arizona 85308<br>Space Id: 2082 | Restaurant | Leased |
| Ashland Town Center<br>500 Winchester Avenue<br>Ashland, Kentucky 41101 | Restaurant | Leased |
| Ashville Mall 2<br>3 S. Tunnel Road<br>Ashville, NC 28805 | Restaurant | Leased |
| Augusta Mall<br>3450 Wrightsboro Road<br>Augusta, Georgia 30909<br>Space Id: 2340 | Restaurant | Leased |
| Aventura Mall<br>19575 Biscayne Boulevard<br>Miami, Florida 33180 | Restaurant | Leased |
| Avi Casino<br>10000 Aha Macav Parkway<br>Laughlin, Nevada 89028 | Restaurant | Leased |
| Baldwin Hills<br>3650 West Martin Luther King Jr. Boulevard<br>Los Angeles, California 90008<br>Space Id: 143 | Restaurant | Leased |
| Bally's<br>3645 Las Vegas Boulevard South<br>Las Vegas, Nevada 89109<br>Space Id: 119 | Restaurant | Leased |
| Barnes Crossing<br>1001 Barnes Crossing Road<br>Tupelo, Mississippi 38801 | Restaurant | Leased |
| Bassett Center<br>6101 Gateway West<br>El Paso, Texas 79925 | Restaurant | Leased |
| Bay Park Square<br>303 Bay Park Square<br>Green Bay, Wisconsin 54304<br>Space Id: 165 | Restaurant | Leased |
| Belden Village<br>4240 Belden Village<br>Canton, Ohio 44718 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Belz Factory Outlet<br>7400 South Las Vegas Boulevard<br>Las Vegas, Nevada 89123<br>Space Id: 21 | Restaurant | Leased |
| BJ's Valley Stream<br>125 Green Acres Road<br>Valley Stream, New York 11581 | Restaurant | Leased |
| Bourse Building<br>111 S. Independence Mall, East<br>Philadelphia, Pennsylvania 19106 | Restaurant | Leased |
| Boynton Beach Mall<br>801 North Congress Avenue<br>Boynton Beach, Florida 33426 | Restaurant | Leased |
| Brea Mall<br>2165 Brea Mall<br>Brea, California 92621 | Restaurant | Leased |
| Bridgewater Commons<br>400 Commons Way<br>Bridgewater, New Jersey 08807 | Restaurant | Leased |
| Buckland Hills<br>194 Buckland Hills<br>Manchester, Connecticut 06040 | Restaurant | Leased |
| Burnsville Center<br>1178 Burnsville Center<br>Burnsville, Minnesota 55337 | Restaurant | Leased |
| Cal State University<br>5151 State University Drive<br>Los Angeles, California 90032 | Restaurant | Leased |
| Carolina Place<br>11025 Carolina Place Park<br>Pineville, North Carolina 28134 | Restaurant | Leased |
| Carousel Center<br>9612 Destiny USA Drive<br>Syracuse, New York 13204<br>Space Id: FC-06 | Restaurant | Leased |
| Cary Village<br>1105 Walnut Street<br>Cary, North Carolina 27511 | Restaurant | Leased |
| Champlain Center North<br>60 Smith Field Boulevard<br>Plattsburgh, New York 12901<br>Space Id: F-101, 727 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Chapel Hill Mall<br>2000 Brittain Road #103<br>Akron, Ohio 44310<br>Space Id: 1034 | Restaurant | Leased |
| Charleston Town<br>3027 Charleston Town Center<br>Charleston, West Virginia 25389 | Restaurant | Leased |
| Charlottesville Fashion Square<br>1574 East Rio Road<br>Charlottesville, Virginia 22901 | Restaurant | Leased |
| Cherryvale Mall<br>7200 Harrision Avenue<br>Rockford, Illinois 61112<br>Space Id: FC-2 | Restaurant | Leased |
| Chicago Ridge Mall<br>516 Chicago Ridge Mall<br>Chicago Ridge, Illinois 60415 | Restaurant | Leased |
| Christiana Mall<br>Route 95 And Route 7<br>Newark, Delaware 19702 | Restaurant | Leased |
| Citadel<br>150 Citadel Road<br>Los Angeles, California 90040<br>Space Id: 148 | Restaurant | Leased |
| City Creek Center<br>28 South State Street<br>Salt Lake City, Utah 84150 | Restaurant | Leased |
| Clackamas Town Center<br>12000 82nd Avenue<br>Happy Valley, Oregon 97086 | Restaurant | Leased |
| Coastland Center<br>1868 Tamiami Trail<br>Naples, Florida 34102 | Restaurant | Leased |
| Cool Springs Galleria<br>1800 Galleria Boulevard<br>Franklin, Tennessee 37067<br>Space Id: 3120 | Restaurant | Leased |
| Coral Square<br>9411 West Atlantic Boulevard<br>Coral Springs, Florida 33065<br>Space Id: 9411 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Cordova Mall<br>5100 North 9th Avenue<br>Pensacola, Florida 32504 | Restaurant | Leased |
| Coronado Mall<br>6600 Menaul Northeast<br>Albuquerque, New Mexico 87110<br>Space Id: I-6 | Restaurant | Leased |
| Crabtree Valley Mall<br>4325 Greenwood Avenue<br>Raleigh, North Carolina 27612 | Restaurant | Leased |
| Crossgates Mall I<br>120 Washington Avenue<br>Albany, New York 12203<br>Space Id: B126 | Restaurant | Leased |
| Crossroads Center<br>4101 West Division Street<br>St. Cloud, Minnesota 56301 | Restaurant | Leased |
| Crossroads Mall, Michigan<br>6650 Westedge Avenue<br>Portage, Michigan 49002<br>Space Id: 229 | Restaurant | Leased |
| Cucinova Easton<br>4044 Morse Crossing<br>Columbus, Ohio 43219 | Restaurant | Leased |
| Cucinova Olentangy<br>1187 Olentangy River Road<br>Columbus, Ohio 43212 | Restaurant | Leased |
| Culver City<br>6000 Sepulveda Boulevard<br>Culver City, California 90230 | Restaurant | Leased |
| Dallas Galleria<br>13350 Dallas Parkway<br>Dallas, Texas 75240 | Restaurant | Leased |
| Dartmouth Medical Center<br>DHMC Suite 835<br>One Medical Center Drive<br>Lebanon, New Hampshire 03755 | Restaurant | Leased |
| Del Amo Fashion Center<br>216 South Del Amo Fashion Court<br>Torrance, California 90503<br>Space Id: 2165 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Dolphin Mall<br>11401 Northwest 12th Street, Suite 118<br>Miami, Florida 33172 | Restaurant | Leased |
| Dover Mall<br>1365 North Dupont Highway<br>Dover, Delaware 19901 | Restaurant | Leased |
| Dulles Town Center<br>2110 Dulles Town Circle, Suite 248<br>Sterling, Virginia 20166 | Restaurant | Leased |
| Eagle Ridge Mall<br>804 Eagle Ridge Drive<br>Lake Wales, Florida 33853<br>Space Id: 611 | Restaurant | Leased |
| Easton Towne Center<br>160 Easton Town Center<br>Columbus, Ohio 43219<br>Space Id: P-100B | Restaurant | Leased |
| Eden Prairie Center<br>1018 Eden Prairie Center<br>Eden Prairie, Minnesota 55344<br>Space Id: 132 | Restaurant | Leased |
| Edison Mall<br>4125 Cleveland Avenue<br>Fort Meyers, Florida 33901 | Restaurant | Leased |
| Fair Oaks Mall<br>11750 Fair Oaks<br>Fairfax, Virginia 22033 | Restaurant | Leased |
| Fairlane Town Center<br>18900 Michigan Avenue<br>Dearborn, Michigan 48126 | Restaurant | Leased |
| Fashion Place Mall<br>6191 State Street<br>Murray, Utah 84107 | Restaurant | Leased |
| Fashion Show Mall<br>3200 Las Vegas Boulevard South<br>Las Vegas, Nevada 89109 | Restaurant | Leased |
| Fashion Valley - La Cucina<br>7007 Friars Road<br>San Diego, California 92108<br>Space Id: 921 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Fayette Mall<br>3379 Nicholasville Road #F<br>Lexington, Kentucky 40503 | Restaurant | Leased |
| First Colony Mall<br>16535 Southwest Freeway<br>Sugar Land, Texas 77479<br>Space Id: 430 | Restaurant | Leased |
| Florida Mall<br>Snakeland Road & Orange #781<br>Orlando, Florida 32809<br>Space Id: 945 | Restaurant | Leased |
| Four Seasons Mall<br>343 Four Seasons Town Center<br>Greensboro, North Carolina 27407 | Restaurant | Leased |
| Fox River Mall<br>4301 West Wisconsin Avenue<br>Appleton, Wisconsin 54913 | Restaurant | Leased |
| Fox Valley Center<br>118 Fox Valley Center<br>Aurora, Illinois 60504 | Restaurant | Leased |
| Franklin Mills<br>1878 Franklin Mills Circle<br>Philadelphia, Pennsylvania 19154 | Restaurant | Leased |
| Franklin Park Mall<br>5001 Monroe Street<br>Toledo, Ohio 43623<br>Space Id: FC6 | Restaurant | Leased |
| Freehold Raceway Mall<br>3710 US Highway 9<br>Freehold, New Jersey 07728 | Restaurant | Leased |
| Galleria At Sunset<br>1300 Sunset Road<br>Henderson, Nevada 89104<br>Space Id: 2845 | Restaurant | Leased |
| Galleria At Fort Lauderdale<br>2446 East Sunrise Boulevard<br>Fort Lauderdale, Florida 33304 | Restaurant | Leased |
| Garden State Plaza<br>Routes 4 And 17<br>Paramus, New Jersey 07653<br>Space Id: 1052 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Georgia Mall<br>3333 Buford Drive<br>Buford, Georgia 30519 | Restaurant | Leased |
| Georgia Square<br>3700 Atlantic Highway<br>Athens, Georgia 30606 | Restaurant | Leased |
| Golf Mill Mall<br>308 Golf Mill Road<br>Niles, Illinois 60648 | Restaurant | Leased |
| Grand Traverse Mall<br>3200 South Airport Road West<br>Traverse City, Michigan 49684 | Restaurant | Leased |
| Grapevine Mills Mall<br>3000 Grapevine Mills Mall<br>Grapevine, Texas 76051 | Restaurant | Leased |
| Great Lake Crossing<br>4402 Baldwin Road<br>Auburn Hills, Michigan 48326<br>Space Id: FC-12 | Restaurant | Leased |
| Greenwood Mall<br>2625 Scottsville Road<br>Bowling Green, Kentucky 42101 | Restaurant | Leased |
| Gurnee Mills<br>6170 West Grand Avenue, #721<br>Gurnee, Illinois 60031 | Restaurant | Leased |
| Hamilton Place<br>2100 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421 | Restaurant | Leased |
| Hanes Mall<br>3320 Silas Creek Parkway, Suite #4<br>Winston Salem, North Carolina 27103 | Restaurant | Leased |
| Haywood Mall<br>700 Haywood Road<br>Greenville, South Carolina 29607<br>Space Id: F-2 | Restaurant | Leased |
| Holyoke Mall<br>50 Holyoke Street<br>Holyoke, Massachusetts 01040 | Restaurant | Leased |
| Houston Galleria<br>5015 Westheimer Street<br>Houston, Texas 77056 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Inland Center<br>108 Inland Center<br>San Bernadino, California 92408 | Restaurant | Leased |
| International Trade Center<br>1300 Pennsylvania Avenue Northwest<br>Washington, DC 20004<br>Space Id: FC 101 | Restaurant | Leased |
| Kenwood Towne Centre<br>7875 Montgomery Road<br>Cincinnati, Ohio 45236 | Restaurant | Leased |
| Kings Plaza Mall<br>2509 Flatbush Avenue<br>Brooklyn, New York 11234 | Restaurant | Leased |
| Lake Forest Mall 2<br>701 Russell Lane<br>Gaitherburg, Maryland 20877<br>Space Id: FC-101 | Restaurant | Leased |
| Lakeside Mall, Louisiana<br>3301 Veterans Boulevard #78H<br>Metairrie, Louisiana 70002 | Restaurant | Leased |
| Las Vegas Convention Center<br>3150 Paradise Road<br>Las Vegas, Nevada 89109 | Restaurant | Leased |
| Los Cerritos Center<br>127 Los Cerritos Center<br>Los Cerritos, California 90701<br>Space Id: FC-13 | Restaurant | Leased |
| Louis Joliet Mall<br>3340 Mall Loop Drive<br>Joliet, Illinois 60435 | Restaurant | Leased |
| Main Place<br>2800 North Main<br>Santa Ana, California 92701 | Restaurant | Leased |
| Mall At Millenia<br>4200 Conroy Road<br>Orlando, Florida 32839<br>Space Id: 255 | Restaurant | Leased |
| Mall Del Norte<br>5300 San Dario #168<br>Laredo, Texas 78041<br>Space Id: 168 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Mall Of America<br>390 SOuth Boulevard<br>Bloomington, Minnesota 55425<br>Space Id: 5390 | Restaurant | Leased |
| Marley Station<br>7900 South Ritchie Highway<br>Glen Burnie, Maryland 21061 | Restaurant | Leased |
| Mayfair Mall<br>2500 North Mayfair Road<br>Wauwatosa, Wisconsin 53226 | Restaurant | Leased |
| Media City 574<br>201 East Magnolia Boulevard<br>Burbank, California 91502<br>Space Id: 386 | Restaurant | Leased |
| Memorial City Mall<br>900 Gessner<br>Houston, Texas 77024<br>Space Id: 395C | Restaurant | Leased |
| Meridian Mall<br>1982 Grand River Avenue<br>Okemos, Michigan 48864 | Restaurant | Leased |
| Millcreek Mall<br>654 Mill Creek Mall<br>Erie, Pennsylvania 16565 | Restaurant | Leased |
| Miller Hill Mall<br>1600 Miller Trunk Highway<br>Duluth, Minnesota 55811 | Restaurant | Leased |
| Monroeville Mall<br>200 Monroeville Mall<br>Monroeville, Pennsylvania 15146 | Restaurant | Leased |
| Monte Carlo Resort & Hotel<br>3770 Las Vegas Boulevard South<br>Las Vegas, Nevada 89109<br>Space Id: B | Restaurant | Leased |
| Montebello Town Center<br>1608 Montebello Town Center<br>Montebello, California 90640 | Restaurant | Leased |
| Moorestown Mall<br>400 West Route 38<br>Moorestown, New Jersey 08057 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Moreno Valley Mall<br>22500 Town Gate Circle<br>Moreno Valley, California 92553<br>Space Id: 2127 | Restaurant | Leased |
| Natick Mall<br>1245 Worchester Road<br>Natick, Massachusetts 01760<br>Space Id: 2000 | Restaurant | Leased |
| New Town Mall<br>400 Mill Avenue, Suite 557<br>New Philadelphia, Ohio 44663<br>Space Id: 557 | Restaurant | Leased |
| Newport Centre Mall<br>30 Mall Drive West<br>Jersey City, New Jersey 07310 | Restaurant | Leased |
| North County Fair<br>200 East Via Rancho Parkway<br>Escondido, California 92025 | Restaurant | Leased |
| North Point Mall<br>2186 Northpoint Circle<br>Alpharetta, Georgia 30202 | Restaurant | Leased |
| North Riverside Park<br>7501 West Cermak Road<br>North Riverside, Illinois 60546<br>Space Id: VC-3 | Restaurant | Leased |
| Northgate Mall<br>5800 Northgate Drive<br>San Rafael, California 94903 | Restaurant | Leased |
| Northlake Mall<br>6801 Northlake Mall Drive<br>Charlotte, North Carolina 28078<br>Space Id: FC-203 | Restaurant | Leased |
| Northwoods Mall<br>2150 Northwoods Boulevard<br>North Charleston, South Carolina 29406<br>Space Id: FC2 | Restaurant | Leased |
| Northwest Arkansas Mall<br>4201 North Shiloh Drive<br>Fayetteville, Arkansas 72703<br>Space Id: 303 | Restaurant | Leased |
| Oakridge Mall<br>925A Blossom Hill Road<br>San Jose, California 95123 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Ocean County Mall<br>1201 Hooper Avenue #1128<br>Toms River, New Jersey 08753 | Restaurant | Leased |
| Outlets of Mississippi<br>200 Bass Pro Drive<br>Pearl, Mississippi 39208 | Restaurant | Leased |
| Pacific View Mall<br>3301-2521 East Main Street<br>Ventura, California 93003 | Restaurant | Leased |
| Palisades Mall<br>3616 Palisades Center Drive<br>West Nyack, New York 10994<br>Space Id: FC-07 | Restaurant | Leased |
| Palm Beach Outlets<br>1741 Palm Beach Lakes Boulevard<br>West Palm Beach, Florida 33401 | Restaurant | Leased |
| Palm Desert Town Center<br>72-840 Highway 111<br>Palm Desert, California 92260<br>Space Id: S361 | Restaurant | Leased |
| Park Meadows Mall<br>8401 Park Meadows Drive<br>Lone Tree, Colorado 80124<br>Space Id: 3032 | Restaurant | Leased |
| Parkway City<br>2801 Memorial Parkway South<br>Huntsville, Alabama 35801 | Restaurant | Leased |
| Pearl Ridge Center<br>98-1005 Moanalua Road<br>Aiea, Oahu, Hawaii 96701 | Restaurant | Leased |
| Pecanland Mall<br>4700 Millhaven Road<br>Monroe, Louisiana 71203 | Restaurant | Leased |
| Philadelphia International Airport<br>B/C Connector<br>8500 Essington Avenue<br>Philadelphia, Pennsylvania 19153<br>Space Id: M8 | Restaurant | Leased |
| Pioneer Place<br>700 Southwest Fifth Avenue<br>Portland, Oregon 97204<br>Space Id: 1145 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Pittsburgh Airport I<br>P.O. Box 12406<br>Midfield Terminal<br>Pittsburgh, Pennsylvania 15231<br>Space Id: AC2B | Restaurant | Leased |
| Plaza Bonita<br>3030 Plaza Bonita Road<br>National City, California 91950 | Restaurant | Leased |
| Polaris Fashion Place<br>1500 Polaris Parkway<br>Columbus, Ohio 43240<br>Space Id: FC-8 | Restaurant | Leased |
| Port Charlotte Town Center<br>1441 Tamiami Trail<br>Port Charlotte, Florida 33948<br>Space Id: 607 | Restaurant | Leased |
| Potomac Mills<br>2700 Potomac Mills Circle<br>Prince William, Virginia 22192 | Restaurant | Leased |
| Prime Outlets Of Williamsburg<br>5625-FC1 Richmond Road<br>Williamsburg, Virginia 23188 | Restaurant | Leased |
| Prince Georges Mall<br>3500 East West Highway<br>Hyattsville, Maryland 20782 | Restaurant | Leased |
| Queens Center<br>90-15 Queens Boulevard<br>Rego Park, New York 11373 | Restaurant | Leased |
| Riverchase Galleria<br>2000 Riverchase Galleria<br>Birmingham, Alabama 35244 | Restaurant | Leased |
| Roosevelt Field Mall<br>630 Old Country Road<br>Garden City, New York 11530<br>Space Id: 2111 | Restaurant | Leased |
| Rosedale Center<br>1595 West Highway 36<br>Roseville, Minnesota 55113 | Restaurant | Leased |
| Royal Hawaiian Shopping Center<br>2259 Kalakaua Avenue<br>Honolulu, Hawaii 96815 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Salmon Run Mall<br>1300 Arsenal Street<br>Watertown, New York 13601<br>Space Id: B128 | Restaurant | Leased |
| Santa Anita Fashion Park<br>400 South Baldwin Avenue, Suite 812-L<br>Arcadia, California 91007 | Restaurant | Leased |
| Santa Monica Place<br>395 Santa Monica Place<br>Santa Monica, California 90401 | Restaurant | Leased |
| Santa Rosa Mall<br>300 Mary Esther Cut-Off<br>Mary Esther, Florida 32569 | Restaurant | Leased |
| Santa Rosa Plaza<br>2108 Santa Rosa Plaza<br>Santa Rosa, California 95401 | Restaurant | Leased |
| Savannah Mall<br>14045 Abercorn Expressway #2606<br>Savannah, Georgia 31419 | Restaurant | Leased |
| Sawgrass Mills, Hurricane Food Court<br>12801 West Sunrise Boulevard<br>Sunrise, Florida 33323 | Restaurant | Leased |
| Sbarro at the Taj Mahal<br>1000 Boardwalk<br>Atlantic City, New Jersey 08401 | Restaurant | Leased |
| Sbarro Cafe<br>401 Broadhollow Road<br>Melville, NY 11747 | Restaurant | Leased |
| Sbarro UCLA<br>308 Westwood Plaza, Level 1<br>Kerckhoff Hall 332<br>Los Angeles, California 90024 | Restaurant | Leased |
| Sbarro's of Orland Square<br>356 Orland Square Mall<br>Orland Park, Illinois 60462 | Restaurant | Leased |
| Scottsdale Fashion Square<br>7014 East Camelback Road<br>Scottsdale, Arizona 85251<br>Space Id: 568 | Restaurant | Leased |
| Short Pump Town Center<br>11800 West Broad Street<br>Richmond, Virginia 23233 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Smithhaven Mall<br>Middle Country Road<br>Lake Grove, New York 11755 | Restaurant | Leased |
| Somerset Collection North<br>2800 West Big Beaver Road<br>Troy, Michigan 48084<br>Space Id: Y327 | Restaurant | Leased |
| South Park Mall<br>768 Southpark Center<br>Strongsville, Ohio 44136<br>Space Id: FC768 | Restaurant | Leased |
| Southern Park<br>7401 West Market Street<br>Youngstown, Ohio 44512<br>Space Id: FC3 | Restaurant | Leased |
| Southlake Mall<br>2288 Southlake Mall<br>Merrillville, Indiana 46410 | Restaurant | Leased |
| Southride Mall, Wisconsin<br>5300 South 76th Street #102<br>Greendale, Wisconsin 53129 | Restaurant | Leased |
| Spring Hill Mall<br>1070 Spring Hill Mall<br>West Dundee, Illinois 60118 | Restaurant | Leased |
| Springfield Mall<br>1250 Baltimore Pike<br>Springfield, Pennsylvania 19064<br>Space Id: 14L | Restaurant | Leased |
| St. Charles Towne Center<br>11110 Mall Circle<br>P.O. Box 6124<br>Waldorf, Maryland 20603 | Restaurant | Leased |
| Stamford Town Center<br>100 Greyrock Place<br>Stamford, Connecticut 06901 | Restaurant | Leased |
| Stonebriar Center<br>2601 Preston Road, Sp 2052<br>Frisco, Texas 75034 | Restaurant | Leased |
| Stonewood Center<br>131 Stonewood Street #FC-1<br>Downey, California 90241 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Summit Mall<br>3265 West Market Street<br>Fairlawn, Ohio 44333<br>Space Id: 178 | Restaurant | Leased |
| Sunrise Mall, New York<br>479 Sunrise Mall<br>Massapequa, New York 11758 | Restaurant | Leased |
| Superstition Springs Center<br>6555 East Southern Avenue<br>Mesa, Arizona 85205<br>Space Id: H-12 | Restaurant | Leased |
| The Avenues<br>10200 Southside Boulevard<br>Jacksonville, Florida 32256<br>Space Id: 301 | Restaurant | Leased |
| The Gardens<br>3101 PGA Boulevard<br>Palm Beach Gardens, Florida 33410 | Restaurant | Leased |
| The Orleans Hotel & Casino<br>4500 West Tropicana Avenue<br>Las Vegas, Nevada 89103 | Restaurant | Leased |
| The Plaza At West Covina<br>805 Plaza Drive<br>West Covina, California 91790 | Restaurant | Leased |
| Town Center<br>14200 E. Alameda Avenue<br>Aurora, Colorado 80012<br>Space Id: VC-01 | Restaurant | Leased |
| Town Center At Cobb<br>400 Earnest Barret Parkway South<br>Kennesaw, Georgia 30144<br>Space Id: 7010 | Restaurant | Leased |
| Town East Mall<br>2063 Town East Mall #3022<br>Mesquite, Texas 75150 | Restaurant | Leased |
| Treasure Coast Square<br>3174 Northwest Federal Highway<br>Jensen Beach, Florida 34957<br>Space Id: 3272 & 3274 | Restaurant | Leased |
| Tuttle Crossing<br>5043 Tuttle Crossing Boulevard<br>Columbus, Ohio 43017<br>Space Id: 168 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| Twelve Oaks<br>27194 Novi Road<br>Novi, Michigan 48377<br>Space Id: 105A | Restaurant | Leased |
| Tysons Corner Center<br>1961 Chain Bridge Road<br>McLean, Virginia 22102 | Restaurant | Leased |
| Union Station<br>50 Massachusetts Avenue, Northeast<br>Washington, DC 20002 | Restaurant | Leased |
| University Of Oklahoma-Student Center<br>900 Asp Avenue<br>Norman, Oklahoma 73069 | Restaurant | Leased |
| Valley Plaza Shopping Center<br>2701 Ming Avenue<br>Bakersfield, California 93304<br>Space Id: 402 | Restaurant | Leased |
| Valley View Mall<br>4802 Valley View Bendd Northwest<br>Roanoke, Virginia 24012<br>Space Id: LC105 | Restaurant | Leased |
| Volusia Mall II<br>1700 West International Speedway Boulevard<br>Daytona Beach, Florida 32114<br>Space Id: 150 (First Level) | Restaurant | Leased |
| Walden Galleria<br>1 Walden Galleria<br>Buffalo, New York 14225<br>Space Id: F-208 | Restaurant | Leased |
| Washington Crown Center Mall<br>1-70, U.S. Route 40<br>Washington, Pennsylvania 15301<br>Space Id: 622 | Restaurant | Leased |
| Washington Square<br>9585 Southwest Washington Square Road<br>Portland, Oregon 97223 | Restaurant | Leased |
| Wellington Green<br>10300 West Forest Hill Boulevard<br>Wellington, Florida 33414 | Restaurant | Leased |
| West Farms Mall<br>185 West Farms Mall<br>Farmington, Connecticut 06032 | Restaurant | Leased |

| Property and Address | Facility Type | Owned or Leased |
|---|---|---|
| West Town Mall<br>7600 Kingston Pike<br>Knoxville, Tennessee 37919<br>Space Id:1300 | Restaurant | Leased |
| Westgate Mall<br>205 West Blackstock Road<br>Spartanburg, South Carolina 29301<br>Space Id: 530 | Restaurant | Leased |
| Westroads Mall<br>10000 California Street #10<br>Omaha, Nebraska 68114 | Restaurant | Leased |
| Westshore Plaza<br>1-275 Westshore Boulevard<br>Tampa, Florida 33609<br>Space Id: J | Restaurant | Leased |
| White Plains Galleria Food Court<br>100 Main Street<br>White Plains, New York 10601 | Restaurant | Leased |
| Woodbridge Mall<br>Sbarro 310 Woodbridge Ctr. Drive<br>Woodbridge, New Jersey 07095 | Restaurant | Leased |
| Woodfield Mall<br>G-123 Woodfield Mall<br>Schaumburg, Illinois 60173 | Restaurant | Leased |
| Woodland Mall<br>3159 28th Street<br>Grand Rapids, Michigan 49508 | Restaurant | Leased |

## SCHEDULE 7

**Location of Substantial Assets, Books and Records, and Non-U.S. Assets**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| | |
|---|---|
| **Substantial Assets** | Facilities set forth in **Schedule 6** |
| **Books and Records** | 401 Broadhollow Road<br>Melville, New York 11747 |
| **Non-U.S. Assets** | Equity in Canada subsidiary |

## SCHEDULE 8

### Pending Litigation

No material actions and proceedings are pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.   Pursuant to Local Bankruptcy Rule 1007-2(a)(11), if necessary, this schedule will be supplemented in the corresponding schedules to be filed by the Debtors in the Chapter 11 Cases.

## SCHEDULE 9

### Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Title | Relevant Experience | Tenure |
|------|-------|---------------------|--------|
| David Karam | President and Chief Executive Officer | Prior to joining Sbarro, Mr. Karam served as the President of Wendy's International, Inc., a subsidiary of Wendy's Restaurants LLC from September 2008 to March 2013. | March 2013 to Present |
| Anthony J. Missano | President, Business Development and Corporate Vice President | Mr. Missano joined Sbarro in 1975.  He served as President of the Quick Service Division from January 2000 to February 2004. | Corporate Vice President 1996 to Present<br><br>President, Business Development February 2004 to Present |
| Carolyn M. Spatafora | Chief Financial Officer | Ms. Spatafora previously served as Senior Vice President of Finance.  Ms. Spatafora joined Sbarro in March 2005 as Director of Finance and Controller.  Prior to joining Sbarro, Ms. Spatafora was employed by Adecco, a staffing services company, for ten years as a Director and Assistant Vice President in positions of Internal Audit and Information Technology.  Ms. Spatafora also spent five years at KPMG as a Certified Public Accountant. | December 2009 to Present |
| Stuart Steinberg | General Counsel and Secretary | Mr. Steinberg is directly employed by Sbarro as Secretary, and acts as the Debtors' General Counsel.  Prior to joining Sbarro, Mr. Steinberg practiced transactional law with Steinberg, Fineo, Berger & Fischoff, P.C. | 2001 to Present |

## SCHEDULE 10

### Payroll

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Group | Estimated Amount |
|---|---|
| **Employees (Not Including Officers, Directors and Stockholders)** | $950,000 |
| **Officers, Stockholders and Directors** | $13,300 |
| **Financial and Business Consultants** | $50,000 |

## SCHEDULE 11

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, and Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Description | Estimated Amount |
|---|---|
| **Cash Receipts** | $15,521,075 |
| **Cash Disbursements** | $21,986,964 |
| **Net Cash Loss** | $6,465,909 |
| **Unpaid Obligations** (excluding professional fees) | $1,744,554 |
| **Unpaid Receivables** (excluding professional fees) | $2,000,000 |