**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SBARRO LLC, *et al.*,[1] | ) | Case No. 14-10557 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### NOTICE OF FILING OF FORM OF
### LICENSE AND SERVICES AGREEMENT AS SET FORTH IN THE
### TRANSACTION STEPS TO ESTABLISH THE NEW FRANCHISING ENTITY

**PLEASE TAKE NOTICE** that on March 10, 2014, Sbarro LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), filed the *Proposed Joint Prepackaged Chapter 11 Plan of Reorganization of Sbarro LLC and Its Debtor Affiliates*, [Docket No. 13] (as amended from time to time, the "***Plan***"), pursuant to which certain materials were required to be filed as a supplement to the Plan.[2]

**PLEASE TAKE FURTHER NOTICE** that on April 7, 2014 the Debtors filed certain documents that comprised the Plan Supplement.[3]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sbarro LLC (1939); Carmela's, LLC (8088); Carmela's of Kirkman LLC (7703); Carmela's of Kirkman Operating, LLC (1182); Corest Management, Inc. (9134); Cucinova Easton LLC (4874); Cucinova Holdings LLC (2698); Cucinova Kenwood LLC (9558); Cucinova Olentangy LLC (8264); Demefac Leasing Corp. (2379); Larkfield Equipment Corp. (7947); Las Vegas Convention Center LLC (7645); New Sbarro Finance, Inc. (6440); New Sbarro Intermediate Holdings, Inc. (9105); Sbarro America, Inc. (9130); Sbarro America Properties, Inc. (9540); Sbarro Blue Bell Express LLC (1419); Sbarro Commack, Inc. (4007); Sbarro Express LLC (0253); Sbarro Holdings, Inc. (7352); Sbarro New Hyde Park, Inc. (6185); Sbarro of Las Vegas, Inc. (2853); Sbarro of Longwood, LLC (0328); Sbarro of Virginia, Inc. (2309); Sbarro Pennsylvania, Inc. (3530); Sbarro Properties, Inc. (9541); Sbarro Venture, Inc. (3182); Sbarro's of Texas, Inc. (5139); Umberto at the Source, LLC (8024); Umberto Deer Park, LLC (8728); Umberto Hauppauge, LLC (8245); Umberto Hicksville, LLC (0989); Umberto Huntington, LLC (8890); and Umberto White Plains, LLC (8159).  The Debtors' service address is:  401 Broadhollow Road, Melville, New York 11747.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[3]    *See Notice of Filing of Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Sbarro LLC and Its Debtor Affiliates* [Docket No. 137].

**PLEASE TAKE FURTHER NOTICE** that on May 12, 2014 the Debtors filed additional exhibits to the Plan Supplement, including the Transaction Steps to Establish the New Franchising Entity.[4]

**PLEASE TAKE FURTHER NOTICE** that on May 19, 2014 the Court approved the Plan, the Plan Supplement, and the implementation of the Transaction Steps to Establish the New Franchising Entity.[5]

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Transaction Steps to Establish the New Franchising Entity, New Franchising Entity and Sbarro LLC will enter into a License and Services Agreement, the form of which is attached hereto as **Exhibit A**.

| | |
|---|---|
| Dated:   June 2, 2014<br>New York, New York | */s/ David S. Meyer*<br>James H.M. Sprayregen, P.C.<br>Edward O. Sassower, P.C.<br>Nicole L. Greenblatt<br>David S. Meyer<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Telephone:   (212) 446-4800<br>Facsimile:   (212) 446-4900<br><br>*Counsel to the Debtors and Debtors in Possession* |

---

[4]   *See Notice of Filing of the First Supplement to the Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Sbarro LLC and Its Debtor Affiliates* [Docket No. 221], Ex. H.

[5]   *See Order Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Sbarro LLC and Its Debtor Affiliates* [Docket No. 238].

## Exhibit A

**Form of License and Services Agreement**

EXECUTION COPY

## LICENSE AND SERVICES AGREEMENT

**THIS LICENSE AND SERVICES AGREEMENT** (the "Agreement"), dated June 2, 2014 (the "Effective Date"), is made by and between Sbarro Franchise Co. LLC, a Delaware limited liability company ("FranchiseCo") and Sbarro LLC, a New York limited liability company ("Company").    FranchiseCo and Company are sometimes referred to herein individually as a "Party" and collectively as the "Parties."  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1 hereof.

## WITNESSETH

**A.    WHEREAS,** FranchiseCo is in the business of franchising third parties to operate Restaurants (together with any related or ancillary activities that FranchiseCo may engage in from time to time, collectively, the "FranchiseCo Business");

**B.    WHEREAS,** Company is in the business of (a) owning and operating (but not franchising) Restaurants and (b) selling certain retail products bearing the SBARRO name on the premises of the Restaurants (collectively, the "Company Business");

**C.    WHEREAS,** Company and FranchiseCo are parties to that certain Assignment and Security Agreement dated as of the Effective Date (the "Assignment and Security Agreement") pursuant to which (a) Company assigned to FranchiseCo all right, title and interest in and to the Licensed Proprietary Rights (as defined below) and the Franchise Agreements (as defined in the Assignment and Security Agreement) and (b) FranchiseCo granted Company a security interest in the Licensed Proprietary Rights and Franchise Agreements to secure the payment of the Secured Obligations (as defined in the Assignment and Security Agreement), all as more fully described in the Assignment and Security Agreement; and

**D.    WHEREAS**, in connection with and as a material inducement to the Parties' to enter into the Assignment and Security Agreement, the Parties are entering into this Agreement pursuant to which (a) FranchiseCo grants Company a license to use the Licensed Proprietary Rights in connection with the conduct of the Company Business, (b) FrachiseCo will make certain payments to Company, and (c) Company provides FranchiseCo the Management Services (as defined below), in each case, pursuant to the terms and conditions of this Agreement.

**NOW THEREFORE**, in consideration of the foregoing, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, do hereby agree as follows:

1.    DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth or as referenced below:

(a)    "Action" has the meaning set forth in Section 5(d).

(b)    "<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.

(c)    "<u>Agreement</u>" has the meaning set forth in the Preamble.

(d)    "<u>Annual Fee</u>" means the Annual Fee Estimate, together with any adjustments as determined by Company and FranchiseCo pursuant to <u>Section 8(b)</u>.

(e)    "<u>Annual Fee Estimate</u>" means an amount equal to the Annual Fee Total, together with any adjustments as determined by Company and FranchiseCo in good faith.

(f)    "<u>Annual Fee Excess</u>" has the meaning set forth in <u>Section 8(b)</u>.

(g)    "<u>Annual Fee Shortfall</u>" has the meaning set forth in <u>Section 8(b)</u>.

(h)    "<u>Annual Fee Total</u>" means an amount equal to the sum of the Monthly Fees for each year during the Term that are actually paid by FranchiseCo to Company, determined on an annual basis as of the yearly anniversary of the Effective Date.

(i)    "<u>Assignment and Security Agreement</u>" has the meaning set forth in the Recitals.

(j)    "<u>Bankruptcy Event</u>" means, with respect to a Person, (i) the filing by such Person of a voluntary petition seeking liquidation, dissolution, reorganization, rearrangement or readjustment, in any form, of its debts under Title 11 of the United States Code (or corresponding provisions of future Laws) or any other bankruptcy or insolvency Law, or such Person's filing an answer consenting to, or acquiescing in any such petition; (ii) the making by such Person of any assignment for the benefit of its creditors, or the admission by such Person in writing of its inability to pay its debts as they mature; (iii) the expiration of sixty (60) days after the filing of an involuntary petition under Title 11 of the United States Code (or corresponding provisions of future Laws), an application for the appointment of a receiver for the assets of such Person, or an involuntary petition seeking liquidation, dissolution, reorganization, rearrangement or readjustment of its debts or similar relief under any bankruptcy or insolvency Law; provided, that the same shall not have been vacated, set aside or stayed within such sixty (60) day period; or (iv) the entry of an order for relief against such Person under Title 11 of the United States Code.

(k)    "<u>Company</u>" has the meaning set forth in the Preamble.

(l)    "<u>Company Business</u>" has the meaning set forth in the Recitals.

(m)    "<u>Contract</u>" means any contract, agreement, lease, license, instrument or other commitment, whether written or oral, that is binding on any person or any part of its property under applicable Law.

(n)     "Corporate Overhead" means the general and administrative costs and expenses required to operate Sbarro Holdings, Inc. and its subsidiaries, including utility costs, rent payments, office supplies and telecommunications costs related to the functioning of Sbarro Holdings, Inc.'s headquarters, but for the avoidance of doubt, shall not include such costs or expenses that are directly related to the conduct of the Company Business (including advertising costs or similar costs and expenses).

(o)     "Direct Costs" means selling, general and administrative costs of FranchiseCo that are directly related to the FranchiseCo Business.

(p)     "Effective Date" has the meaning set forth in the Preamble.

(q)     "FranchiseCo" has the meaning set forth in the Preamble.

(r)     "FranchiseCo Business" has the meaning set forth in the Recitals.

(s)     "Governmental Authority" means any federal, state, local, foreign or international court, government, department, commission, board, bureau, agency, official or other regulatory, administrative, governmental authority, quasi-governmental or self-regulatory organization.

(t)     "Initial Term" has the meaning set forth in Section 10(a).

(u)     "Law" means any statute, law, ordinance, regulation, rule, code or other requirement of, or order issued by, a Governmental Authority.

(v)     "Licensed Marks" means the "SBARRO" Mark and other Marks set forth on Schedule 1, as may be amended from time to time by FranchiseCo.

(w)     "Licensed Proprietary Rights" means the Licensed System, the Licensed Marks, the copyright registrations set forth on Schedule 2, and any other intellectual property rights now or hereafter owned by FranchiseCo and used in or necessary for the conduct of the Company Business.

(x)     "Licensed System" means the system of methods, procedures, special designs, food formulas and recipes, menus, operating policies and advertising techniques that are related to the conduct of the Company Business, including all rights that are in the nature of the foregoing generally authorized for use by franchisees under the Franchise Agreements, as the foregoing may be modified from time to time by FranchiseCo.

(y)     "Management Services" has the meaning set forth in Section 7(a).

(z)     "Marks" means all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, designs and other source or business identifiers (including any such rights arising from the use of any Internet domain names), together with all translations, adaptations, derivations, and combinations thereof, and, in each case, all registrations and recordations thereof and all applications and renewals in connection therewith and all goodwill associated therewith.

(aa)    "Monthly Fee" means an amount, determined on a monthly basis during the Term, equal to the lesser of (i) $833,333.33 and (ii) one hundred percent (100%) of FranchiseCo's Net Revenue minus Direct Costs during such one month period.

(bb)    "Net Revenue" means the (i) gross receipts minus (ii) actual costs and expenses paid by FranchiseCo, including applicable taxes, rebates and payments in respect of indebtedness, in each case that are directly related to the FranchiseCo Business.

(cc)    "Party" and "Parties" has the meaning set forth in the Preamble.

(dd)    "Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person, including each of the Parties.

(ee)    "Pre-Corporate Overhead EBITDA" means earnings of Company before income taxes, net interest expense, depreciation, amortization and Corporate Overhead.

(ff)    "Renewal Term" has the meaning set forth in Section 10(b).

(gg)    "Restaurants" means restaurants operated under the SBARRO Mark.

(hh)    "Term" has the meaning set forth in Section 10(b).

(ii)    "Termination Fee" means an amount, determined as of any point in time, equal to, as of such point in time, (i) the Threshold Amount minus (ii) any amounts paid by FranchiseCo to Company pursuant to this Agreement.

(jj)    "Third-Party Service Provider" means a Person other than Company or any Affiliate of Company who provides, in whole or in part, a service to FranchiseCo related to the Management Services.

(kk)    "Threshold Amount" means $20 million ($20,000,000).

2.    GRANT OF LICENSE

(a)    Upon the terms and conditions hereinafter set forth, FranchiseCo hereby grants to Company, during the Term, a personal, non-transferable, worldwide, non-exclusive right (even as to FranchiseCo) to use, in any lawful manner whatsoever, the Licensed Proprietary Rights in connection with the conduct of the Company Business.  For the avoidance of doubt, Company shall not, and shall not have the right to, use in any manner whatsoever, the Licensed Proprietary Rights to grant franchises.

(b)    The license granted under Section 2(a) includes the right to use the Licensed Marks, in whole or part, in the corporate name of Company or any of its direct or indirect subsidiaries existing as of the Effective Date in accordance with the terms and conditions of this Agreement.

(c)     The license granted under Section 2(a) includes the right to reference Internet domain names that include the Licensed Marks (e.g., sbarro.com) solely in the manner instructed by FranchiseCo (or it designee) and otherwise in accordance with the terms and conditions of this Agreement.

(d)     Any and all rights in modifications, improvements to, or derivative works based upon the Licensed Proprietary Rights, and any new Marks, copyrights, elements of the Licensed System or other intellectual property or proprietary rights, developed, created, applied for, or registered (as applicable) by or on behalf of Company, shall be owned by, and are hereby assigned by Company to, FranchiseCo (to the extent such rights do not vest in FranchiseCo by operation of law) and shall automatically be included in and part of the Licensed Proprietary Rights.

(e)     For the avoidance of doubt, to the extent that Company receives payments under the Franchise Agreements (as defined in the Assignment and Security Agreement), the Company shall hold such payments in trust for the account of FranchiseCo. FranchiseCo shall have the right to apply such payments against the fees payable by FranchiseCo under Section 8 and upon such application, such payments shall be released from trust to Company.

3.     SUBLICENSING

Company shall not have the right to grant to any Person a sublicense of or under any of its rights under this Agreement, unless:

(a)     Company obtains the prior written consent of FranchiseCo;

(b)     the terms of any such sublicense are in writing, in a form and substance reasonably satisfactory to FranchiseCo and, in any event, contain quality control provisions no less strict than those contained in this Agreement;

(c)     each sublicense terminates automatically on termination or expiration of this Agreement;

(d)     Company is responsible for any breaches of this Agreement caused by any sublicensee; and

(e)     any act or omission of the sublicensee that would be a material breach of this Agreement if performed by Company shall be deemed to be a material breach of this Agreement by Company.

4.     PROSECUTION AND MAINTENANCE

The Parties acknowledge and agree that:  (a) all applications or registrations for the Licensed Proprietary Rights shall be filed or applied for in FranchiseCo's name; (b) FranchiseCo, at its own cost and expense, shall have the right (but not the obligation) to file and maintain the applications or registrations related to the Licensed Proprietary Rights (including the Marks and copyrights identified on Schedule 1 and Schedule 2, respectively); and (c)

Company shall cooperate with FranchiseCo, at FranchiseCo's sole cost and expense, to the extent reasonably requested by FranchiseCo, in preparing, executing, filing and prosecuting applications to register the Licensed Proprietary Rights and other related registrations and in maintaining all registrations related to the Licensed Proprietary Rights as may issue, including by providing specimens of use. FranchiseCo shall have the sole and exclusive right to maintain or renew any registration for the Licensed Proprietary Rights. Notwithstanding the foregoing, in the event FranchiseCo determines not to maintain or renew any registration for any Licensed Proprietary Rights used in the conduct of the Company Business, FranchiseCo shall provide written notice to Company of the same, in which case Company shall have the right (but not the obligation) to maintain or renew such registration, at Company's sole cost and expense; provided, that Company shall keep FranchiseCo apprised of the status of any such maintenance and renewal activities. FranchiseCo shall cooperate with Company, at Company's sole cost and expense, to the extent reasonably requested by Company, in maintaining or renewing any registrations for the Licensed Proprietary Rights hereunder. FranchiseCo shall have the sole and exclusive right to file and apply for applications related to the Licensed Proprietary Rights. Company may, by written request to FranchiseCo, request that FranchiseCo file or prosecute an application for registration of any Licensed Proprietary Rights or derivations thereof, for use in the conduct of the Company Business. If (x) FranchiseCo declines to file and/or prosecute an application for registration of any Licensed Proprietary Rights or derivations thereof, for use in connection with the Company Business, (y) the Licensed Proprietary Rights and the use thereof as described in the written request otherwise comply with the terms of this Agreement, and (z) FranchiseCo does not reasonably believe that the application for or registration of such Licensed Proprietary Rights would have a materially adverse impact on the FranchiseCo Business or the goodwill associated with any of the Licensed Marks, then, notwithstanding the foregoing, Company shall be permitted to do the same, in FranchiseCo's name, at Company's sole cost and expense, upon fifteen (15) days prior written notice to FranchiseCo; provided, that Company shall keep FranchiseCo apprised of the status of any such filing, registration or prosecution activities. For the avoidance of doubt and except as set forth herein, Company shall obtain FranchiseCo's prior written consent before registering or using any Internet domain name that contains any portion of the Licensed Marks or any derivation thereof.

5.    OWNERSHIP; USE; INFRINGEMENT

(a)    FranchiseCo reserves all rights with respect to the Licensed Proprietary Rights not expressly granted herein. FranchiseCo owns and shall retain the full and complete ownership of, and all other right, title and interest in and to, the Licensed Proprietary Rights, including all goodwill associated therewith, subject only to the specific rights expressly granted to Company pursuant to this Agreement. All rights and goodwill arising from (i) Company's use of the Licensed Proprietary Rights and (ii) Company's provisions of the Management Services, shall, in each case, inure solely to the benefit of FranchiseCo.

(b)    The license granted to Company under this Agreement only extends to the use of the Licensed Proprietary Right to the extent, and in the form and manner, expressly permitted by this Agreement. Without limiting the generality of the foregoing, Company shall not use any Licensed Mark in combination with any other Mark or any Internet domain name (including to create a co-brand or with any logo, design or other designation), or any Mark or

Internet domain name that is confusingly similar to any Licensed Mark, without FranchiseCo's prior written consent.

(c)    Company shall not challenge the ownership, validity or enforceability of any of the Licensed Proprietary Rights.

(d)    FranchiseCo shall have the exclusive right to control, in its own name, any claim, demand, litigation, opposition, cancellation or other legal proceedings, whether actual or threatened (each an "Action") relating to any alleged infringement or other violation, claim of invalidity or unenforceability, or other challenge to FranchiseCo's rights in the Licensed Proprietary Rights, at its sole cost and expense. Company shall, and shall cause all of its Affiliates to, provide all cooperation and assistance reasonably requested by FranchiseCo, at FranchiseCo's sole cost and expense, in connection with any Action brought by FranchiseCo hereunder. FranchiseCo shall be entitled to all of the proceeds received as a result of any Action described in this Section 5(d) (or any settlement or compromise thereof), subject to reimbursement of Company's costs and expenses incurred as a plaintiff or co-plaintiff. Notwithstanding the foregoing, in the event FranchiseCo elects not to take any Action to enforce the Licensed Proprietary Rights in accordance with this Section 5(d), Company shall be permitted to take such Action, represented by counsel of its own choice, at its own cost and expense, upon at least fifteen (15) days prior written notice to FranchiseCo. In such case, Company shall be entitled to all of the proceeds received as a result of such Action (or any settlement or compromise thereof). FranchiseCo shall, at Company's cost and expense, provide all cooperation and assistance reasonably requested by Company in connection with any Action brought by Company hereunder. Company shall not, without FranchiseCo's prior written consent, settle or otherwise compromise any such Action if such settlement or compromise would or could restrict FranchiseCo's rights to use, own, transfer or register any of the Licensed Proprietary Rights.

6.    QUALITY CONTROL

(a)    In order to preserve the value of the goodwill associated with the Licensed Marks, Company acknowledges and agrees that the quality standards for all goods and services to be marketed, promoted, offered and provided by Company under the Licensed Marks pursuant to this Agreement shall be substantially equivalent to or stricter than those standards used by Company for like goods and services immediately prior to the Effective Date. Company further acknowledges that the maintenance of such quality of goods and services in connection with which Company uses the Licensed Marks is of the essence to this Agreement.

(b)    All food products bearing or offered under the Licensed Marks by Company shall be suitable for human consumption, consistent with the standards for restaurant services employed by Company immediately prior to the Effective Date. Company shall ensure that the appearance and condition of all facilities operated by Company are consistent with standards at least as high as those in existence immediately prior to the Effective Date. Company shall permit FranchiseCo (or its designee) to make inspections of the premises, fixtures, supplies, merchandise, and personnel of Company at all reasonable times upon reasonable advance notice to ensure Company's compliance with the provisions of this Section

<u>6</u>.  If any inspection report indicates any deficiency or unsatisfactory condition or conditions, Company shall promptly correct or begin to correct any such deficiency or unsatisfactory condition.

(c)     Company shall comply strictly with any directions of FranchiseCo (or its designee) regarding the form and manner of the application of the Licensed Marks as may be provided from time to time by FranchiseCo.

7.     <u>SERVICES</u>

(a)     In consideration of the grant of the license to use the Licensed Proprietary Rights, without any cost or expense to FranchiseCo, during the Term, Company shall provide FranchiseCo with management services in the ordinary course consistent with past practice and reasonably necessary for FranchiseCo to conduct its ongoing business, including, without limitation, those services described on <u>Schedule 3</u> (collectively, the "<u>Management Services</u>"), in each case subject to the terms and conditions of this Agreement.

(b)     Company agrees that (i) all Management Services provided during the Term shall be performed with at least the same degree of care as Company exercises in performing similar services for its own account and (ii) it will provide the Management Services in accordance with applicable Law.

(c)     The Parties acknowledge that Company may provide the Management Services directly, through an Affiliate of Company or through one or more Third-Party Service Providers; provided that Company shall remain liable for its obligations hereunder and any breach by such Affiliate or Third-Party Service Provider of the terms of this Agreement.

(d)     FranchiseCo agrees that FranchiseCo shall provide cooperation and assistance as reasonably requested by Company in connection with Company's provision of the Management Services.

8.     <u>FEES</u>

(a)     During the Term, for each one (1) month period beginning on the Effective Date, FranchiseCo shall pay, or cause to be paid, to Company an amount equal to the Monthly Fee. The Monthly Fee shall be payable by FranchiseCo promptly (but in any event within ten (10) business days) after Company delivers to FranchiseCo a statement indicating the amount of the Monthly Fee for each applicable month during the Term (which Company shall prepare and deliver to FranchiseCo as promptly as reasonably practicable, but in any event within 45 days, after the end of the month).

(b)     On the day of each yearly anniversary of the Effective Date, during the Term and upon termination or expiration of this Agreement, Company shall prepare and deliver to FranchiseCo as promptly as reasonably practicable, but in any event within 90 days after such anniversary date, the Annual Fee Estimate. Company and FranchiseCo shall negotiate in good faith any changes to the Annual Fee Estimate to determine the Annual Fee for the applicable contract year.  To the extent the Annual Fee, as finally determined pursuant to this <u>Section 8(b)</u>, is greater than the Annual Fee Total (such shortfall amount, the "<u>Annual</u>

Fee Shortfall"), FranchiseCo shall promptly (but in any event within ten (10) business days) after the date of determination of the Annual Fee pay, or cause to be paid, to Company an amount equal to the Annual Fee Shortfall.  To the extent the Annual Fee, as finally determined pursuant to this <u>Section 8(b)</u>, is less than the Annual Fee Total (such excess amount, the "<u>Annual Fee Excess</u>"), Company shall promptly (but in any event within ten (10) business days) after the date of determination of the Annual Fee pay, or cause to be paid, to FranchiseCo an amount equal to the Annual Fee Excess.

(c)    Company shall be responsible for, and pay, all (i) costs, fees or expenses of third party service providers that are related to the Management Services and (ii) travel-related expenses incurred by Company in performing the Management Services.

9.    <u>REPRESENTATIONS AND WARRANTIES</u>

Each Party represents, warrants and covenants to the other Party as follows:

(a)    It has been duly organized, is validly existing and is in good standing under the Law of its jurisdiction of incorporation, with the power and authority to conduct its business, to enter into this Agreement, and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite action on its part.

(b)    This Agreement has been duly executed and delivered and is a valid and binding obligation of that Party and enforceable against it, in accordance with its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(c)    The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (i) violate or conflict with any applicable Law; or (ii) result in a violation or breach of, conflict with, constitute a default under, or give rise to any right of termination, cancellation, or acceleration of any obligation or a loss of a material benefit under any of the Licensed Proprietary Rights or any Contract binding upon that Party or any of its Affiliates.

(d)    EXCEPT FOR THE EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT, EACH PARTY EXPRESSLY DISCLAIMS ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, REGARDING THE LICENSED PROPRIETARY RIGHTS, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

10.    <u>TERM; RENEWAL</u>

(a)    The term of this Agreement commences on the Effective Date and shall continue thereafter for a period of one (1) year (the "<u>Initial Term</u>") unless sooner terminated in accordance with <u>Section 11</u> or renewed in accordance with this <u>Section 10</u>.

(b)    Upon expiration of the Initial Term, this Agreement shall automatically renew for three (3) additional one (1) year terms (unless sooner terminated in accordance with Section 11) (each a "Renewal Term" and, together with the Initial Term, the "Term"), in the case of each Renewal Term, if and only if, as of the beginning of any such Renewal Term, (i) Company is operating the Company Business in the ordinary course of business as of immediately prior to the Effective Date, (ii) Company is in material compliance with the terms and conditions of this Agreement and (iii) the Pre-Corporate Overhead EBITDA for the trailing twelve months (as of any date of determination) is not less than $5 million ($5,000,000). Notwithstanding the foregoing and for the avoidance of doubt, if any of the conditions of clauses (i) - (iii) of this Section 10(b) are not satisfied as of the beginning of such Renewal Term, the parties shall have the ability to agree to extend the Term of this Agreement; provided, that if the Agreement neither automatically renews in accordance with this Section 10(b) nor is renewed as a result of the agreement of the parties, the Agreement shall not be renewed and shall terminate.

11.    DEFAULT; TERMINATION

(a)    In the event of any material default by either Party in its performance of any of the terms and conditions of this Agreement, FranchiseCo or Company, as the case may be, may, on sixty (60) days advance written notice, terminate this Agreement, subject however to the right of the Party against whom the default is claimed to cure any default within such sixty (60) day period, in which event this Agreement shall remain in full force and effect.

(b)    FranchiseCo may terminate this Agreement at any time upon ninety (90) days prior written notice; provided, that FranchiseCo shall pay or cause to be paid to Company or its designees an amount equal to the Termination Fee, with the timing of payment of the Termination Fee to be mutually agreed upon between Company and FranchiseCo; provided, further, that if this Agreement is terminated by FranchiseCo because of Company's material default that is uncured in accordance with this Section 11(a), FranchiseCo shall not owe Company payment of the Termination Fee.

(c)    FranchiseCo shall have the right to terminate this Agreement at any time during the Term, effective immediately upon written notice to Company, if: (i) there is a direct or indirect change of control of Company; or (ii) Company becomes subject to a Bankruptcy Event; provided, that FranchiseCo shall pay or cause to be paid to Company or its designees an amount equal to the Termination Fee, with the timing of payment of the Termination Fee to be mutually agreed upon between Company and FranchiseCo.

(d)    If (i) the Term is not renewed in accordance with Section 10(b) solely because the condition for renewal set forth in Section 10(b)(iii) has not been satisfied (and if the conditions for renewal set forth in Sections 10(b)(i) and 10(b)(ii) have been satisfied), FranchiseCo shall pay or cause to be paid to Company or its designees an amount equal to the Termination Fee, with the timing of payment of the Termination Fee to be mutually agreed upon between Company and FranchiseCo.

(e)    Due to the valuable goodwill associated with the Licensed Marks, and the irreparable harm that would arise from any injury to such goodwill, in the event of any

material breach by Company of Sections 2, 3, 5(b), 5(c) or 6 of this Agreement, FranchiseCo shall have the right to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court, in addition to any other remedy to which FranchiseCo may be entitled under this Agreement, at Law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity.

(f)     The following provisions shall survive termination or expiration of this Agreement: Sections 5(a), 5(b) and 5(c), (Ownership), 12 (Rights upon Termination or Expiration), 13 (Indemnification), 14 (Effect of Company Bankruptcy), 15 (Assignment), 16 (Relationship between Parties), 17 (Notice), 18 (Choice of Law), 19 (Further Assurances) and 20 (General Conditions).

## 12.    RIGHTS UPON TERMINATION OR EXPIRATION; TERMINATION ASSISTANCE

(a)     Upon the termination or expiration of this Agreement, any and all rights of Company to use the Licensed Proprietary Rights shall automatically cease, and Company shall promptly cease all use of the Licensed Proprietary Rights and thereafter shall not adopt or use any word or Mark that is confusingly similar to any of the Licensed Marks. Notwithstanding the foregoing, upon termination or expiration of this Agreement, Company (a) shall have forty-five (45) days from the date of termination or expiration to sell existing inventory of any products bearing any of the Licensed Proprietary Rights and (b) so long as Company is making best efforts to wind-down the use of all Licensed Proprietary Rights, Company may continue to use the Licensed Proprietary Rights in connection with winding-down the operation of Restaurants owned by Company for up to forty-five (45) days from the date of termination or expiration.

(b)     Upon the termination or expiration of this Agreement, Company shall as promptly as practicable (but in any event within 5 business days of such termination or expiration) notify all counterparties to the Franchise Agreements (as defined in the Assignment and Security Agreement) to pay all fees payable under such Franchise Agreements to such account or accounts as are designated in writing by FranchiseCo.

(c)     Upon the termination or expiration of this Agreement, Company shall provide to FranchiseCo such disengagement assistance as FranchiseCo may request in good faith.  Company shall perform such disengagement assistance at its own cost and expense and shall be reimbursed by FranchiseCo for its reasonable and documented out-of-pocket costs with respect thereto.

## 13.    INDEMNIFICATION

Each Party agrees to indemnify and hold the other Party and its officers, directors, employees, shareholders, Affiliates and agents harmless from and against any claim, suit, loss, liability, damage, demand or expense, or cause of action arising from or relating to (a) the indemnifying Party's use of the Licensed Proprietary Rights or (b) the gross negligence or willful misconduct of the indemnifying Party.

#4845-3317-3019

14.      EFFECT OF COMPANY BANKRUPTCY

The Parties acknowledge and agree that this is an executory contract and that if Company becomes subject to a Bankruptcy Event, Company shall not be permitted to assume, or assume and assign, this Agreement pursuant to Section 365(c)(1) of the U.S. Bankruptcy Code or otherwise. For the avoidance of doubt, FranchiseCo does not consent to the assumption, or assumption and assignment, of this Agreement in the event of Company becoming subject to a Bankruptcy Event.

15.      ASSIGNMENT

This Agreement shall not be assignable by either Party without the prior written consent of the non-assigning Party.  Notwithstanding the preceding sentence, FranchiseCo may assign or transfer its rights and obligations under this Agreement to its Affiliates or to a Person that succeeds to all or substantially all of such party's business or assets to which this Agreement relates whether by sale, merger, operation of law or otherwise. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assignees. Any transfer or assignment of this Agreement in violation of this Agreement shall be null and void. Company shall not grant a security interest, lien, or other encumbrance on or in this Agreement or its rights hereunder, without the prior written consent of FranchiseCo.

16.      RELATIONSHIP BETWEEN PARTIES

The relationship of the Parties is that of independent contractors.  Nothing contained in this Agreement shall be construed to place the Parties in the relationship of legal representatives, partners, joint venturers, agents or fiduciaries, and neither Party shall take any action nor incur any debts, obligations or liabilities in the name of the other.

17.      NOTICE

All notices required or permitted to be given by this Agreement shall be in writing (including facsimile transmission) and shall be given as follows:

If to Company:          Sbarro LLC
                        401 Broadhollow Road
                        Melville, NY 11747
                        Telephone:  631-715-4160
                        Facsimile:  631-715-4186
                        Attention:  General Counsel


If to FranchiseCo:      Sbarro Franchise Co. LLC
                        401 Broadhollow Road
                        Melville, NY 11747
                        Telephone: 631-715-4160
                        Facsimile: 631-715-4186
                        Attention:  General Counsel

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient if received prior to 5:00 PM in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

18.    CHOICE OF LAW

This Agreement shall be deemed to have been made and shall be interpreted, and the rights and liabilities of the Parties hereto determined, in accordance with the Laws of the State of New York without giving effect to the principles of conflicts of laws thereof.

19.    FURTHER ASSURANCES

From time to time after the Effective Date, and for no further consideration, each of the Parties shall, and shall cause its Affiliates to, execute, acknowledge and deliver such assignments, transfers, consents, assumptions and other documents and instruments and take such other commercially reasonable actions as may reasonably be requested to effectuate the purposes of this Agreement.

20.    GENERAL CONDITIONS

(a)    This Agreement, including the Exhibits attached hereto, together with the Assignment and Security Agreement, constitute the entire agreement between the Parties with respect to the subject matter hereof.

(b)    This Agreement may only be amended or modified as agreed to by both Parties and reflected in writing signed by both Parties.

(c)    This Agreement shall inure to the benefit of and shall bind the respective Parties and their respective successors and permitted assigns.

(d)    If any portion of this Agreement shall be held to be invalid, unenforceable or illegal, it shall not affect the validity of any other provisions or term of this Agreement and the invalid, illegal, or unenforceable provision or term shall be reformed to the extent necessary to render such provision or term valid and enforceable and to reflect the intent of the Parties to the maximum extent possible under applicable Law.

(e)    The failure of either Party to require the performance of any term of this Agreement or the waiver by either Party of any breach under this Agreement shall not prevent subsequent enforcement of such term, nor be deemed a waiver of any subsequent breach.

(f)    The section headings within this Agreement are for convenience only and shall not be deemed to affect in any way the language of the provisions to which they refer.

(g)     Unless the context of this Agreement otherwise requires, (i) words of one gender include the other gender; and (ii) words using the singular or plural number also include the plural or singular number, respectively.  References to days are to calendar days unless specified otherwise.  References to any Law are to that statute, act, or regulation as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to "Schedules" or "Exhibits" are to the Schedules and Exhibits attached to this Agreement.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.

(h)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement effective as of the Effective Date.

SBARRO FRANCHISE CO. LLC

By:   New Sbarro Intermediate Holdings, Inc., its
      Sole Member


By: _____
Title:

SBARRO LLC


By: _____
Title:

## Schedule 1

**Licensed Marks**

[Intentionally Omitted]

## **Schedule 2**

**Copyrights**

[Intentionally Omitted]

## Schedule 3

**Services**

[Intentionally Omitted]